**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ARIEL SEAFOODS OF FLORIDA, INC.,
A.P. BELL FISH COMPANY, INC.,
SLASH CREEK WATERWORKS, INC.
FISH TRAP, INC., JOHN DAVID STEED,
and SCOTT OSBORNE,

*Plaintiffs*

v.

HOWARD LUTNICK, in his official capacity as Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE,

*Defendants*

Case No. 26-cv-3468

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This case challenges an illegal fishery management action taken by Defendants Howard Lutnick, in his official capacity as Secretary of Commerce, and the National Marine Fisheries Service ("NMFS"). Specifically, on September 21, 2026, Defendants issued so-called "exempted fishing permits" to the states of Florida, Georgia, and South Carolina, which increase dramatically the amount of recreational red snapper landings this year, and in so doing, make major changes to the South Atlantic red snapper annual catch limit mechanism.

2. The factual record establishes that under the challenged permits, the recreational sector will receive a far larger share of the total landings that occur in 2026, than is provided for by the governing allocation ratio for the stock. The record also establishes that recreational red snapper landings in 2026 will exceed substantially the annual catch limit that was set for the stock under the mechanism established in the Fishery Management Plan for the Snapper-Grouper

Fishery of the South Atlantic ("FMP"). Furthermore, the record reflects that NMFS's issuance of the permits relied on facially incorrect assumptions and incomplete consideration of the problem at hand.

3. Ensuring fair and equitable allocations, managing stocks with annual catch limits and accountability, and using the best scientific information available are core requirements of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d ("Magnuson-Stevens Act" or "the Act").

4. The Magnuson-Stevens Act nowhere allows Defendants to waive the statutory requirements for fair and equitable allocations, annual catch limit management, or use of the best scientific information available—whether through the use of "exempted fishing permits" or otherwise.

5. Excessive recreational landings of South Atlantic red snapper in 2026 will disadvantage the commercial sector and may end up harming the stock. Commercial fishermen will share the cost of this mismanagement going forward—while also being forced to watch their share in the fishery be diluted by the significant expansion of recreational landings.

6. Plaintiffs in this case are commercial fishermen and fishing companies. Defendants' illegal action impacts Plaintiffs' ability to harvest red snapper, thereby affecting their revenues and the value of their investments in the fishery. Defendants' action also undermines the integrity of the management system in the South Atlantic, and may damage an important natural resource and ocean health—upon which Plaintiffs depend for their livelihoods and way of life.

7. Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA") and the Magnuson-Stevens Act, as well as the Declaratory Judgment Act, 28 U.S.C. § 2201, the All

Writs Act, 28 U.S.C. § 1651, and this Court's equitable authority, Plaintiffs respectfully request the Court declare the challenged permits contrary to law, vacate them, and provide further relief as necessary.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this case pursuant to the Magnuson-Stevens Act, which provides that the "district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Act. 16 U.S.C. § 1861(d).

9. Subject matter jurisdiction also is provided under the federal question provision of the Judicial Code, as U.S. District Courts have "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

10. The Magnuson-Stevens Act provides procedures for judicial review in certain situations—specifically, for regulations promulgated under the Act, and actions taken under fishery management plan regulations:

> (1) Regulations promulgated by the Secretary under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the APA], if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that—
>
> > (A) section 705 of such title is not applicable, and
> >
> > (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.
>
> (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.
>
> . . .
>
> (4) Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

*Id.* § 1855(f).

11. As noted above, the Magnuson-Stevens Act's grant of jurisdiction to Federal district courts is broad, encompassing "any case or controversy arising under" the Act whatsoever. 16 U.S.C. § 1861(d). By contrast, the Act's judicial review provision at Section 1855(f) is narrower, covering only a specific subset of cases arising under the Act.

12. Given this structure, there are cases and controversies that arise under the Act yet fall outside the scope of Section 1855(f). *See, e.g.*, *Southeastern Fisheries Ass'n v. Lutnick*, No. 26-cv-1533-RC, Slip Op. at 9–11 (D.D.C. May 21, 2026); *Kāpa'a v. Trump*, No. 25-cv-209-MWJS-WRP, Slip Op. at 24 n.5 (D. Haw. Aug. 8, 2025) (noting "[t]here are many classes of claims left untouched by § 1855(f)" (internal quotation omitted)).

13. To the extent such cases involve challenges to agency actions, the claim for judicial review is provided by the APA. *See, e.g.*, *id.* at 24 ("Even when Section 1855(f) does not apply, judicial review of a Magnuson Act claim may be available under the APA, which authorizes judicial review of final agency action 'for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)); *see also Southeastern Fisheries Ass'n*, Slip Op. at 9–10 (noting APA review remains available in such situations); *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 21 (D.C. Cir. 2008) (noting, with respect to an action by NMFS falling outside the scope of Section 1855(f), that "APA review would appear to suffice").

14. Plaintiffs here challenge three exempted fishing permits that were issued by Defendants on September 21, 2026, to the states of Florida, Georgia, and South Carolina (collectively, "the Exempted Fishing Permits"). North Carolina is the final state comprising the South Atlantic region, but as discussed further below, North Carolina did not apply for a red snapper exempted fishing permit alongside the other states.

15. The Exempted Fishing Permits were issued by Defendants under general nationwide regulations located at 50 C.F.R. § 600.745(b). *See Southeastern Fisheries Ass'n*, Slip Op. at 11 (noting issuance under nationwide regulations).

16. The Exempted Fishing Permits were not issued by Defendants under Snapper-Grouper Fishery Management Plan regulations, which are located at 50 C.F.R. Part 622, Subpart I (i.e., sections 622.170 to 622.194). *See Southeastern Fisheries Ass'n*, Slip Op. at 11 (noting same).

17. Because the Exempted Fishing Permits are not actions "taken by the Secretary under regulations which implement a fishery management plan," 16 U.S.C. § 1855(f)(2), the Magnuson-Stevens Act's specific judicial review provision at Section 1855(f) does not apply.

18. Instead, the claim in this case arises directly from the APA, and ordinary APA procedures govern. *See Southeastern Fisheries Ass'n*, Slip Op. at 11; *Kāpa'a*, Slip Op. at 24; *see also N.C. Fisheries Ass'n*, 550 F.3d at 21.

19. This case was filed on October 5, 2026, and therefore is timely under the applicable statute of limitations. *See* 28 U.S.C. § 2401(a) (six-year statute of limitations under APA). *Cf.* 16 U.S.C. § 1855(f) (thirty-day statute of repose under Magnuson-Stevens Act).

20. This Court has remedial jurisdiction to issue declaratory relief under the Declaratory Judgment Act. *See* 28 U.S.C. § 2201. Procedures for issuing declaratory relief are provided by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 57.

21. This Court has remedial jurisdiction to vacate the Exempted Fishing Permits under the APA. *See* 5 U.S.C. § 706(2). Substantive factors relating to vacatur are provided by *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), and subsequent case law.

22. This Court has remedial jurisdiction to issue injunctive relief and/or a stay of the Exempted Fishing Permits under the APA, *see id.* § 705. It further has remedial jurisdiction to issue injunctive relief under the Magnuson-Stevens Act, *see* 16 U.S.C. § 1861(d)(1), as well as pursuant to its inherent equitable powers and the All Writs Act. *See* 28 U.S.C. § 1651. Procedures for issuing injunctive relief are provided by the Federal Rules of Civil procedure. *See* Fed. R. Civ. P. 65.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e)(1)(A)–(B), and 5 U.S.C. § 703, because the Federal Defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

24. Plaintiff Ariel Seafoods of Florida, Inc. ("Ariel Seafoods") is a corporation organized under the laws of Florida, with its principal place of business located in Destin, Florida. Ariel Seafoods is a seafood buyer, processor, and distributor/wholesaler, and in that capacity buys fish from independently-owned fishing vessels in both the Gulf and the South Atlantic. In 2006 Ariel opened a second fish house in Sebastian, Florida. The Sebastian facility gathers fish along the Atlantic coast from Port Canaveral to Key West, and processes for distribution throughout the United States and Canada. Ariel Seafoods purchases South Atlantic red snapper when the commercial season for that species is open, running trucks to and from Sebastian with freshly-caught fish. Ariel Seafoods takes pride in bringing domestically-caught fish to market, and in being part of the chain of commercial fishermen and businesses that supply our nation with fresh, local seafood. Ariel Seafoods actively follows fishery management actions

by the Gulf and South Atlantic Fishery Management Councils, including specifically the management of South Atlantic red snapper. Through its owner and president, David Krebs, Ariel Seafoods advocates broadly for sustainable management of U.S. fisheries and for fair and equitable allocations for the commercial sector.

25. Plaintiff A.P. Bell Fish Company, Inc. ("A.P. Bell") is a corporation organized under the laws of Florida, with its principal place of business located in Cortez, Florida. A.P. Bell is a commercial fishing business, whose operations include commercial fishing (via vessels and permits owned by the company itself); buying fish from independent fishing vessels; processing fish; packing fish; and distributing and selling fish both at the wholesale and retail level. The majority owner and President of A.P. Bell is Karen Bell, who represents the third generation of the Bell family to run the company. A.P. Bell and its leadership and staff are proud to be part of our U.S. commercial fishing industry, and they take seriously their job of supplying fresh domestic seafood to American consumers. Through Ms. Bell, A.P. Bell tracks fishery management at both the Gulf and South Atlantic Fishery Management Councils, and engages as necessary to support the commercial fisheries in both regions. While most of the company's operations pertain to the Gulf region, A.P. Bell does own a South Atlantic commercial Snapper-Grouper permit. A.P. Bell recently leased out a vessel in the South Atlantic and assigned the permit to that vessel, earning revenue from the harvest of Snapper-Grouper species while enabling an independent fisherman to participate in the fishery. The company plans to lease and assign the permit again in a similar manner in the future. A.P. Bell also regularly purchases fish from the South Atlantic region, including very recently a shipment of three hundred South Atlantic red snapper from Port Orange, Florida.

26. Plaintiff Slash Creek Waterworks, Inc. ("Slash Creek") is a corporation organized under the laws of North Carolina and located in Hatteras, North Carolina. Slash Creek was established in 1982, and the company holds a South Atlantic Snapper-Grouper limited entry permit. In the course of its business operations, Slash Creek fishes for, lands, and sells various Snapper-Grouper species including red snapper. Slash Creek's owner, Jeffrey Oden, has fished commercially for 49 years and continues to captain Slash Creek's vessel, the F/V Second Wind. Through Oden, Slash Creek has participated in the South Atlantic Fishery Management Council process for decades—attending meetings, tracking management issues, participating in the Snapper-Grouper Advisory Panel, and providing public comment. In his role as owner of Slash Creek, Oden strongly supports the commercial fishing industry and works to maintain the community of individuals involved in the industry. Slash Creek advocates for sustainable and fair fishery management, which Oden believes is critical for commercial fishing to stay viable into the future—particularly given the sharp increase in recreational fishing pressure in recent decades.

27. Plaintiff Fish Trap, Inc. ("Fish Trap") is a corporation organized under the laws of Florida, with its principal place of business located in Citrus Springs, Florida. Fish Trap is a commercial fishing business, which owns a commercial fishing vessel, a South Atlantic Snapper-Grouper permit, and other permits. Under its Snapper-Grouper permit, Fish Trap harvests South Atlantic red snapper with hook and line gear when the commercial season is open. In recent years, Fish Trap has landed limits of South Atlantic red snapper across most of the days of the commercial season; Fish Trap expects to do the same in future seasons. Fish Trap, through its owner, Trevor McMahan, tracks fishery management developments at the South Atlantic Fishery Management Council, including red snapper issues. McMahan has 37 years of experience

commercial fishing (over three decades of which have been through Fish Trap), and he relies solely on commercial fishing for his livelihood. Equitable and sustainable fishery management is very important to Fish Trap and McMahan, particularly in light of the dramatic increases in recreational fishing power in the South Atlantic region in recent decades.

28. Plaintiff David Steed ("Steed") is a commercial fisherman operating out of Sebastian, Florida. Steed has fished commercially for 46 years, throughout the South Atlantic and Gulf of Mexico regions. He owns a commercial fishing vessel with a Snapper-Grouper permit (among others), allowing him to land and sell South Atlantic Snapper-Grouper species pursuant to applicable regulations. Steed fishes with hook and line gear, targeting Coastal Migratory Pelagics and Snapper-Grouper species in different combinations and geographies throughout the year. When the commercial season is open for South Atlantic red snapper, Steed catches and sells red snapper, thereby earning a portion of his annual income from the stock. Steed has a strong interest in the fair and equitable treatment of commercial fishermen, with respect to South Atlantic red snapper, as well as in sustainable management of the stock. Having attended decades of South Atlantic Fishery Management Council meetings, Steed has watched managers fumble and fail to address the basic needs of commercial fishermen, while allowing the recreational sector to remain open-access and steadily expand.

29. Plaintiff Scott Osborne ("Osborne") is a commercial fishermen based on Florida's East coast. Osborne owns a commercial fishing vessel with a Snapper-Grouper limited entry permit, among others. He fishes for mackerel, snappers and groupers, amberjack, tilefish, and various other species depending on location and season. When the South Atlantic red snapper season is open, Osborne regularly lands limits of red snapper. Osborne has been fishing for 42 years, much of that time in the South Atlantic region. He regularly tracks the fishery

management process at the South Atlantic Fishery Management Council, reading reports and listening to meetings. Osborne was a member of the Council's Snapper-Grouper Advisory Panel, serving the maximum term of nine years. He continues to engage with and provide public comment to the Council, despite regularly disagreeing with the decisions that come out of the Council process. Over the past few decades, Osborne has watched the commercial Snapper-Grouper sector decline, as some fishermen age out and others cannot make ends meet. At the same time, the recreational sector has continued to expand in both numbers and fishing power. Osborne believes successful fishery management means stocks that are managed for long-term sustainability, and catch allocations that are made in a fair and equitable manner—so that at the end of the day, there is enough fish for everyone.

30. Plaintiffs are harmed in several ways by the illegal Exempted Fishing Permits challenged in this case.

31. First and most obviously, Plaintiffs' share in the fishery is being diluted by the Exempted Fishing Permits, which significantly increase the amount of recreational landings without any corresponding increase in commercial landings. The governing allocation ratio for South Atlantic red snapper is 28.07% commercial and 71.93% recreational, as applied to landings. *See* 77 Fed. Reg. 15,916, 15,924 (Mar. 16, 2012) (Amendment 25 final rule). Under the Exempted Fishing Permits, recreational landings will be increased from a SRFS-converted level of 21,726 fish to a new (also SRFS-converted) level of 112,787 fish. This is more than a five-fold increase in recreational landings, with no change to commercial landings. As a result, over 90% of the total red snapper landings this year will go to the recreational sector, with less than 10% going to the commercial sector. So commercial fishermen and fishing businesses, like Plaintiffs, will receive a diminished share of the benefits coming from the fishery.

32. Allocations are a central feature of fishery management under the Magnuson-Stevens Act because they define the relative amount of catch each sector can expect, rely on, and plan around. For this reason, the Act provides for allocation decisions to be hammered out at the council level, with everybody getting a chance to provide input; the Act also provides substantive standards regarding fairness and equity governing the eventual outcome. *See* 16 U.S.C. § 1851(a)(4) (National Standard 4). Allocations take on even more importance for rebuilding stocks, like South Atlantic red snapper. *See id.* § 1854(e)(4)(B) (extra allocation requirement for rebuilding stocks). By unilaterally changing the allocation ratio for South Atlantic red snapper, NMFS here is disrupting the compromise established in Amendment 25, and stripping Plaintiffs and their commercial colleagues of the benefit of that bargain.

33. In the situation at hand, NMFS claims to have "discovered" a pile of extra South Atlantic red snapper available for landings. The amount is around 90,000 fish,[1] so under the governing allocation ratio for this fishery, approximately 25,000 of those fish should go to the commercial sector.[2] This would be a big deal for commercial fishermen and fishing businesses, who have been constrained for years to a tiny 75-pound commercial trip limit for South Atlantic red snapper. Yet instead, NMFS in the Exempted Fishing Permits is taking the fish that should go to the commercial sector, and reallocating it to the recreational sector.

[1] The specific amount can be described in different ways depending on the units used. As measured in terms of Florida's State Reef Fish Survey (SRFS), which tracks private angler landings and discards, the newly added landings are around 90,000 fish. If measured in terms of the Marine Recreational Information Program – Fishing Effort Survey (MRIP-FES), which tends to run higher than SRFS, the amount is in the ballpark of 200,000 fish.

[2] The exact number would depend on conversion procedures from SRFS units to commercial landings; the point here is simply that under the governing allocation ratio, a certain proportion of available landings go to the commercial sector.

34. The second way Plaintiffs are harmed is that they will be left paying the bill for the Exempted Fishing Permits in future years. By dramatically increasing recreational landings this year, NMFS is—by definition—removing more fish from the population than otherwise would be the case. Because this is a shared resource, and future available harvest is determined by stock health, squeezing the South Atlantic red snapper stock hard this year means fewer red snapper will be available for landings in future years than otherwise would be the case. Given that the commercial sector is excluded from any benefit of the near-term action (as noted above), this is simply a losing proposition for Plaintiffs and their colleagues.

35. Population-based consequences become particularly important if NMFS ends up exceeding the threshold for safe harvest this year. Rebuilding stocks like South Atlantic red snapper are sensitive to overharvest, and catching too many fish in one year can risk lasting repercussions—like extending the stock's rebuilding plan, or having to tighten catch limits in order to ensure the stock rebuilds on time. As discussed in more detail below, there are several ways in which NMFS has failed to show that the Exempted Fishing Permits represent a safe harvest level for South Atlantic red snapper, and to the extent NMFS allows population health to be set back, commercial fishermen like Plaintiffs will be left "sharing the bill" for the action.

36. Third, NMFS's action undermines the integrity of the fishery management process, which harms Plaintiffs by reducing their ability to invest and make long-term business planning decisions. With respect to South Atlantic red snapper specifically, Plaintiffs and other commercial fishermen and businesses have dealt with extremely low trip limits and short seasons for over fifteen years now, on the understanding that this would be paid back with a rebuilt stock and higher landings. NMFS has stated that rebuilding is not far off, but now suddenly is making major changes to the stock's annual catch limit mechanism through a one-off action, and

reallocating fish away from the commercial sector while allowing arbitrarily high catch by the recreational sector. By sweeping the ordinary rules off the table in this way, the Exempted Fishing Permits make it extremely difficult for Plaintiffs and others to plan business decisions around red snapper's rebuilding trajectory. More broadly, NMFS's action makes it difficult to imagine making any investment in the fishery, given that the catch limit mechanism and allocations can be waved off with no consequence. With no confidence in the management system, investment declines, the value of permits and business operations decrease, and the industry simply dries up.

37. Defendant Howard Lutnick, the United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has formal responsibility for the administration and implementation of the Magnuson-Stevens Act, as well as for compliance with all other federal laws applicable to the Department of Commerce. Lutnick, through his designee NMFS, as described below, approved and issued the exempted fishing permits at issue in this case. He is sued in his official capacity.

38. Defendant NMFS is a federal agency within the Department of Commerce, with the responsibility of protecting and managing the fish, marine mammals, and other marine resources of the United States. NMFS has been delegated authority from the Secretary of Commerce to implement and enforce the Magnuson-Stevens Act. NMFS is the government agency primarily responsible for ensuring that the requirements of the Magnuson-Stevens Act are followed and enforced, including the requirement to manage fisheries through the use of annual catch limits and accountability measures, as well as the requirement to prevent overfishing. NMFS took the challenged action in this lawsuit by approving and issuing the Exempted Fishing Permits.

## LEGAL BACKGROUND

### The Magnuson-Stevens Fishery Conservation and Management Act

39. Congress enacted the Magnuson-Stevens Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1).

40. The Act asserts sole United States jurisdiction over, and sovereign rights to, all fish and fishery management authority within the Exclusive Economic Zone ("EEZ")—an area commencing with the outside boundary of state waters, and extending to a line 200 nautical miles offshore of the United States. *Id.* §§ 1811(a), 1802(11); *see also* Presidential Proclamation 5030, 97 Stat. 1557 (Mar. 10, 1983).

41. There are a few exceptions to the Act's assertion of sovereignty over fishery resources within the EEZ, but they are not relevant to this case. *See, e.g.*, *id.* § 1812.

42. To govern the fishery resources in the EEZ, the Magnuson-Stevens Act establishes eight Regional Fishery Management Councils, each with a distinct geographical jurisdiction. *Id.* § 1852(a). One of these councils is the South Atlantic Fishery Management Council, which is charged with managing fisheries in the federal waters off North Carolina, South Carolina, Georgia, and the east coast of Florida. *Id.* § 1852(a)(1)(C).

43. The councils are tasked with preparing fishery management plans and amendments for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), as well as with recommending regulations to implement such plans and amendments, *id.* § 1853(c).

44. The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments, and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

45. The Act requires that all fishery management plans, plan amendments, and implementing regulations be consistent with ten "National Standards" for fishery conservation and management. *Id.* § 1851(a).

46. National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id.* § 1851(a)(1). Optimum yield is defined in the Act, *see id.* § 1802(33), but it is not relevant to the claims at issue in this case.

47. The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by NMFS clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass or reproductive potential falls below the level at which it can produce maximum sustainable yield on a continuing basis (i.e., the state of being depleted). *See* 50 C.F.R. § 600.310(e)(2)(i).

48. National Standard 2 mandates that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). The agency has set forth its interpretation of National Standard 2 in regulatory guidelines, which are located at 50 C.F.R. § 600.315.

49. National Standard 4 provides that "[i]f it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an

excessive share of such privileges." *Id.* § 1851(a)(4). NMFS has interpreted National Standard 4 via regulatory guidelines at 50 C.F.R. § 600.325.

50. Other National Standards address coordination, efficiency, contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(3), (5)–(10).

51. In addition to the National Standards, the Magnuson-Stevens Act provides specific requirements applicable to all fishery management plans. One such requirement is to contain management measures that are "necessary and appropriate for the conservation and management of the fishery to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A).

52. Another fishery management plan requirement is to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery), and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery." *Id.* § 1853(a)(10).

53. A further requirement, applicable where rebuilding plans or other measures that reduce overall harvest are necessary, is to "allocate . . . any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery." *Id.* § 1853(a)(14).

54. Other fishery management plan requirements include assessing and specifying maximum sustainable yield and optimum yield, *id.* § 1853(a)(3), examining data needs and data

collection requirements, *id.* § 1853(a)(5), and identifying essential fish habitat, *id.* § 1853(a), among other things.

**Annual Catch Limits**

55. At the turn of the 21st Century, nearly thirty years into federal management, overfishing remained a problem in many fisheries. Even after Congress strengthened the Magnuson-Stevens Act's sustainability requirements in 1996—adding measures like mandatory rebuilding plans and habitat protection—NMFS and the Councils continued to struggle with ending overfishing.

56. Congress responded in 2006, amending the Act to add a new requirement that fundamentally changed federal fisheries management: annual catch limits. All fishery management plans from that point forward were required to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), *codified at* 16 U.S.C. § 1853(a)(15).

57. Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. This sounds simple, but it represented a radical change for many federal fisheries, which for decades had been managed with no meaningful accountability.

58. Congress made its intent clear that annual catch limits should be treated as actual limits—meaning caps that are not to be exceeded. *See, e.g.*, 151 Cong. Rec. S12840, S12850 (daily ed. Nov. 15, 2005) (statement of Sen. Ted Stevens) ("[T]his bill mandates the use of annual catch limits which shall not be exceeded."); S. Rep. No. 109–229, at 7 (2006) (describing

annual catch limit requirement as "scientifically established annual catch limits be[ing] set and adhered to in each managed fishery"); *id.* at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit."); *accord* National Marine Fisheries Service, National Standard Guidelines, 74 Fed. Reg. 3178, 3183 (Jan. 16, 2009) ("NMFS decided, that since Congress called for annual catch limits to be set, that the ACL should be considered a true limit—a level not to be exceeded.").

59. The annual catch limit requirement, and the accountability it created, was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. This was stated directly in the text of the Act, which requires annual catch limits to be set "at a level such that overfishing does not occur." 16 U.S.C. § 1853(a)(15). It also is underscored by the legislative history. *See, e.g.*, S. Rep. No. 109–229, at 6-7 (2006) (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"); *accord* 50 C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits "must prevent overfishing" when measured against a stock's status determination criteria).

60. Congress did not exempt any fisheries or sectors from the annual catch limit mandate. "Catch," as used in the annual catch limit requirement, means all fish killed by fishing activity, whether the fishing is recreational or commercial in nature, and whether the fish are retained or discarded. *See, e.g.*, S. Rep. No. 109–229, at 23–24 (2006) ("Catch of all species, whether targeted or taken as bycatch, whether retained or discarded, count toward the annual catch limits, and fisheries are closed when these limits are reached."); *accord* 50 C.F.R.

§ 600.310(f)(1)(i) (NMFS regulatory guidelines defining catch as "the total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries," and specifying that "[c]atch includes fish that are retained for any purpose, as well as mortality of fish that are discarded.").

61. After 2006, overfishing rates across U.S. fisheries dropped significantly as annual catch limit management was adopted. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

**National Standard 1 Guidelines**

62. The Magnuson-Stevens Act directs NMFS to "establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans." 16 U.S.C. § 1851(b). NMFS's guidelines for National Standard 1 are codified at 50 C.F.R. § 600.310. After Congress amended the Act in 2006, NMFS revised its National Standard 1 Guidelines to set forth a framework for implementing the new catch limit mandate. *See* 74 Fed. Reg. 3178 (Jan. 16, 2009).

63. Under the agency's guidelines, the "[m]aximum fishing mortality threshold (MFMT)" is "the level of fishing mortality (i.e. F), on an annual basis, above which overfishing is occurring." 50 C.F.R. § 600.310(e)(2)(i)(C). The "[o]verfishing limit (OFL)" is "the annual amount of catch that corresponds to the estimate of MFMT applied to a stock or stock complex's abundance and is expressed in terms of numbers or weight of fish." *Id.* § 600.310(e)(2)(i)(D). NMFS states clearly in the Guidelines that "[e]xceeding the MFMT for a period of 1 year

constitutes overfishing," and "[e]xceeding the annual OFL for 1 year constitutes overfishing." *Id.* § 600.310(e)(2)(ii)(A)(1)–(2).

64. The OFL sits at the top of a hierarchy of numerical reference points, in which each successive value is set at or below the one before it, so that catch is constrained with a sufficient degree of confidence that overfishing will not occur.

65. Below the overfishing limit is the "acceptable biological catch," or ABC. The ABC is "a level of a stock or stock complex's annual catch, which is based on an ABC control rule that accounts for the scientific uncertainty in the estimate of OFL, any other scientific uncertainty, and the Council's risk policy." *Id.* § 600.310(f)(1)(ii). "ABC may not exceed OFL." *Id.* § 600.310(f)(3).

66. Below the ABC is the annual catch limit, or ACL. The ACL is "a limit on the total annual catch of a stock or stock complex, which cannot exceed the ABC, that serves as the basis for invoking AMs [accountability measures]." *Id.* § 600.310(f)(1)(iii). The annual catch limit is the statutorily-mandated centerpiece of the framework, and management measures must be calibrated at or below the ACL.

67. Below the ACL, managers can optionally set an annual catch target, or ACT. ACTs are used to account for management uncertainty—which is "uncertainty in the ability of managers to constrain catch so that the ACL is not exceeded, and the uncertainty in quantifying the true catch amounts." *Id.* § 600.310(f)(1)(v). If an ACT is not used, then management uncertainty "should be accounted for in the ACL" directly. *Id.* § 600.310(f)(4)(i).

68. The Guidelines are explicit about what happens when the hierarchy collapses, and the catch limit is set at the overfishing limit: "If a Council recommends an ACL which equals ABC, and the ABC is equal to OFL, the Secretary may presume that the proposal would not

prevent overfishing, in the absence of sufficient analysis and justification for the approach." *Id.* § 600.310(f)(4)(i).

69. An ACL "may be divided into sector-ACLs," such as separate limits for the commercial and recreational sectors. *Id.* § 600.310(f)(1)(iii), (f)(4)(ii). Where sector ACLs are used, "the sum of sector-ACLs must not exceed the stock or stock complex level ACL," and "[t]he system of ACLs and AMs designed must be effective in protecting the stock or stock complex as a whole." *Id.* § 600.310(f)(4)(ii).

70. Accountability measures are the enforcement side of the annual catch limit mechanism. They "are management controls to prevent ACLs, including sector-ACLs, from being exceeded, and to correct or mitigate overages of the ACL if they occur." *Id.* § 600.310(g)(1). The Guidelines call for in-season accountability measures, such as closures once a certain amount of catch has occurred, "to prevent catch from exceeding ACLs," *id.* § 600.310(g)(2), as well as post-season accountability measures if an ACL is exceeded, such as paybacks the following year to recover the overage, *id.* § 600.310(g)(3).

71. For stocks in rebuilding plans, such as South Atlantic red snapper, post-season accountability measures "should include overage adjustments that reduce the ACLs in the next fishing year by the full amount of the overage, unless the best scientific information available shows that a reduced overage adjustment, or no adjustment, is needed to mitigate the effects of the overage." *Id.* § 600.310(g)(3).

**Experimental Permitting Process**

72. In addition to the National Standards and requirements for fishery management plans, the Magnuson-Stevens Act assigns some direct responsibilities to NMFS. As a practical matter, the bulk of these direct responsibilities pertain to reviewing proposed fishery

management plans and regulations, 16 U.S.C. § 1854(a)–(b); preparing secretarial plans or amendments when necessary, *id.* § 1854(c); and dealing with a handful of other contingencies and specific management situations, *id.* §§ 1854(d)–(i), 1855(a)–(d).

73. One minor statutory responsibility for NMFS is to establish and fund a "Cooperative Research and Management Program." *Id.* § 1867. This requirement is located in Section 1867, which was added to the Act in 2006. *See* Pub. L. No. 109-479, § 204, 120 Stat. 3575, 3614–15 (Jan. 12, 2007). Section 1867 describes the program to be established, and addresses eligibility, funding, and other similar topics. *See* 16 U.S.C. § 1867(a)–(f).

74. By its terms, the program is one "to address needs identified under this chapter and under any other marine resource laws enforced by the Secretary." *Id.* § 1867(a). The needs identified in the Act include ensuring that fishery resources are placed "under sound management before overfishing has caused irreversible effects," *id.* § 1801(a)(8), and that fisheries are conserved and managed "to prevent overfishing, to rebuild overfished stocks, [and] to insure conservation," *id.* § 1801(a)(6).

75. Within Section 1867, Congress included a subsection instructing NMFS to create a standardized permitting process for experimental fishing permits:

> (d) EXPERIMENTAL PERMITTING PROCESS.— . . . the Secretary, in consultation with the Councils, shall promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits.

*Id.* § 1867(d).

76. In response to this instruction from Congress, NMFS revised its nationwide regulations regarding exempted fishing permits. *See* 72 Fed. Reg. 72,657 (Dec. 21, 2007) (proposed rule); 74 Fed. Reg. 42,786 (Aug. 25, 2009) (final rule), *codified at* 50 C.F.R. §§ 600.10, 600.745.

77. NMFS addressed Section 1867(d) in the rulemaking, interpreting it as a directive from Congress to update and clarify its existing procedures around scientific research, exempted fishing, and educational activities, in light of new conservation mandates that had been added to the law in 1996 and 2006. Specifically, Congress had enacted requirements to rebuild stocks, minimize bycatch, protect essential fish habitat, and use annual catch limits, and because "[t]hese new [conservation] requirements resulted in an increased interest in fisheries research," NMFS stated, an update to the regulations was needed. 72 Fed. Reg. at 72,657.

78. Among other things, NMFS in the rulemaking made changes to certain definitions at 50 C.F.R. § 600.10, and revised 50 C.F.R. § 600.745, which is the section of NMFS's nationwide regulations dealing with scientific research, exempted fishing, and educational activities. *See* 74 Fed. Reg. at 42,792–96.

79. The agency stated its belief that the term "experimental," which Congress had used in Section 1867, was synonymous with its own regulatory term "exempted":

> *Exempted or experimental fishing* means fishing from a vessel of the United States that involves activities otherwise prohibited by this chapter VI, but that are authorized under an exempted fishing permit (EFP). The regulations in § 600.745 refer exclusively to exempted fishing. References elsewhere in this chapter to experimental fishing mean exempted fishing under this part.

74 Fed. Reg. at 42,793, *codified at* 50 C.F.R. § 600.10 (italics in original).

80. NMFS further asserted, in the rulemaking, that its concept of "exempted" fishing permits allowed for fishing activity "outside prescribed fishing regulations." 72 Fed. Reg. at 72,658.

81. The agency did not address what sort of fishery management regulations it believed could be waived, through the use of an "exempted" fishing permit. *See id.* at 72,657–64 (proposed rule); 74 Fed. Reg. at 42,786–96 (final rule).

82. The agency did, however, make clear in the rulemaking that exempted fishing permits do not operate outside the substantive requirements of the Act. NMFS stated that "[a]ny permit issued by NMFS is a Federal action, and as such must comply with any and all applicable laws." 74 Fed. Reg. at 42,787. With respect to fishing mortality under such permits, NMFS stated it "needs to be properly accounted for and analyzed, consistent with [National Standard 1], the [National Standard 1] Guidelines, and [Magnuson-Stevens Act] section 303(a)(15)," *id.* at 42,788, and that "[i]t is very important that . . . any mortality is accounted for consistent with [National Standard 1], the [National Standard 1] Guidelines, and [Magnuson-Stevens Act] section 303(a)(15), as well as other [Magnuson-Stevens Act] provisions and other applicable laws," *id.*

83. Earlier this year, this Court considered the relationship between exempted fishing permits and the substantive requirements of the Magnuson-Stevens Act, in the context of a challenge to four exempted fishing permits for South Atlantic red snapper that NMFS issued in May 2026. The Court held that "any EFPs the NMFS issues must comply with the MSA," and that "at a minimum, each EFP the agency issues—including data collection projects—must 'address' . . . the 'needs' . . . Congress identified within Chapter 38, several of which emphasize the need to prevent overfishing." *Southeastern Fisheries Ass'n v. Lutnick*, No. 26-cv-1533-RC, Slip Op. at 12–13 (D.D.C. May 21, 2026). The Court further concluded that Congress did not give NMFS "unbridled discretion to circumvent the MSA and fishery management plan framework through the EFP process," observing that EFPs "must 'address' the 'needs' identified under the MSA—not provide an escape hatch from them," and that "[s]uch needs include the overarching requirement that fisheries be managed to prevent and end overfishing." *Id.* at 20–21.

**The Administrative Procedure Act**

84. The APA sets forth basic process requirements for federal rulemaking, including public notice and opportunity to comment, and required timelines for making a final rule effective. *See* 5 U.S.C. § 553. It also provides a cause of action in judicial review for "[any] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," *id.* § 702, as well as judicial remedies such as preliminary relief and vacatur of agency actions, *id.* §§ 705, 706(2).

85. In judicial review cases under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Courts also must set aside any agency action that is taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

86. An agency action violates APA Section 706(2)(A) "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

87. An agency action also violates APA Section 706(2)(A) when the agency fails to follow its own regulations. "It is axiomatic . . . that an agency is bound by its own regulations," and an agency may not "ignore or violate its regulations while they remain in effect." *Nat'l Env't Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up).

88. An agency action violates APA Section 706(2)(C) if the underlying statute, properly construed, does not authorize the challenged action. *See, e.g.*, *Am. Fed. Gov't Empls. v. Shinseki*, 709 F.3d 29 (D.C. Cir. 2013); *Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197 (D.D.C. 2015).

89. Where an agency provides an opportunity for public comment, it must respond to significant comments received. " '[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.'" *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) (per curiam)). Significant comments are those "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed" action. *Home Box Office*, 567 F.2d at 35 n.58.

90. When an agency departs from its prior policy or practice, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotations omitted).

91. Judicial review of agency action is limited to " 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Post hoc rationalizations offered in litigation cannot sustain an agency action that was not adequately justified at the time it was taken.

## FACTUAL BACKGROUND

**Red Snapper and the Historical Snapper-Grouper Fishery**

92. Red snapper (*Lutjanus campechanus*) is a highly valued marine fish whose primary distribution in U.S. waters extends from the Gulf of Mexico to Cape Hatteras, North Carolina. Red snapper live on the continental shelf, with juveniles inhabiting shallow nearshore waters and adults occupying deeper waters generally in the 60-300 foot depth range. Adults tend to live in areas with structured bottom habitat such as rocky reefs, though they also may be found over sandy or muddy bottom areas at times. Red snapper can live for over fifty years, and grow to a size of 40 inches and 50 pounds. Females reach reproductive maturity between 1 and 3 years of age, but reproductive output increases with age such that older adults are significantly more productive than younger ones.

93. People have fished for snappers and groupers for centuries, in the area now known as the U.S. Southeast. The first commercial landings were recorded in 1880. Through the remainder of the 1800s and the first few decades of the 1900s, commercial landings stayed at relatively modest levels—such that they are assumed to have not significantly impacted the stock. *See, e.g.*, Southeast Data, Assessment, and Review, SEDAR 73: South Atlantic Red Snapper Stock Assessment Report, Section II at 24 (Mar. 2021) ("SEDAR 73") (discussing model initialization), *available at* https://sedarweb.org/documents/sedar-73-stock-assessment-report-south-atlantic-red-snapper.

94. By the 1950s, however, vessel power and navigational systems had improved, and commercial fishing capacity for snappers and groupers increased substantially. *See generally* South Atlantic Fishery Management Council, Fishery Management Plan, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fishery of the

South Atlantic Region, at 29-32 (Mar. 1983) ("Snapper-Grouper FMP"), *available at* https://safmc.net/documents/snapper-grouper-fishery-management-plan.

95. From 1950 through the early 1980s, South Atlantic red snapper commercial landings generally stayed in the range of 300,000–600,000 pounds per year. *See* Southeast Fisheries Science Center, Update of SEDAR 73 Assessment: Stock Assessment of Red Snapper off the Southeastern United States, at 32 (Dec. 2024) ("SEDAR 73 Update") (Table 12), *available at* https://sedarweb.org/documents/sefsc-2024-update-to-sedar-73-south-atlantic-red-snapper-assessment. Recreational landings were starting to ramp up in a significant way during this period, however, and with pressure from both sectors on the resource, it was time for a management plan.

**Early Federal Management of Red Snapper**

96. Federal management of red snapper formally began in 1983, when the recently-formed South Atlantic Fishery Management Council drafted and adopted the original Snapper-Grouper Fishery Management Plan (FMP). Under the FMP, red snapper are managed along with fifty-odd other species of snappers, groupers, basses, porgies, grunts, tilefishes, triggerfishes, wrasses, and jacks that inhabit federal waters in the South Atlantic region. *See generally* Snapper-Grouper FMP, at 1–7.

97. Red snapper was understood to already be subject to overfishing (i.e., the rate of fishing was unsustainably high), at the time the Snapper-Grouper FMP was adopted. *See id.* at vii-viii. The FMP provided a minimum size limit for red snapper of 12 inches, in an attempt to reduce mortality rates for the stock. *Id.* at viii.

98. High red snapper landings continued through the 1980s, however, and the stock declined to a low abundance by 1990. *See* SEDAR 73 Update, *supra* ¶72, at 72 (Figure 14).

NMFS and the Council introduced a handful of further management measures for red snapper in 1991, including an increased size limit, bag limits, and certain gear prohibitions, and established a rebuilding time period of 15 years, intended to restore the stock to healthy levels by 2006. *See* South Atlantic Fishery Management Council, Final Amendment Number 4, Regulatory Impact Review, Initial Regulatory Flexibility Analysis and Environmental Assessment (Apr. 1991), *available at* https://safmc.net/documents/snapper-grouper-amendment-4.

99. Population analyses during the 1990s found that red snapper continued to be subject to overfishing, and the stock accordingly was listed as "overfished" in NMFS's first Status of Stocks Report. *See* National Marine Fisheries Service, Status of Fisheries of the United States: Report to Congress, at PDF 5 (Sept. 1997), *available at* https://repository.library.noaa.gov/view/noaa/15601.

100. New management measures were introduced in the late 1990s, including an aggregate bag limit, limited entry commercial permits, and a commercial capacity reduction program—which required (and still requires today) a 2-for-1 exchange of permits any time a permit transfer is made. *See* South Atlantic Fishery Management Council, Final Amendment 8 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (July 1997), *available at* https://safmc.net/documents/snapper-grouper-amendment-8.

**The Rise of Recreational Snapper-Grouper Fishing**

101. Recreational offshore fishing in the U.S. Southeast was a modest affair in the immediate postwar years. Anglers used relatively small wooden vessels, equipped with simple navigational aids. Catch was naturally constrained by the difficulty of accessing offshore fishing grounds, and coastal population in the region remained at moderate levels. *See, e.g.*, Rusty Hudson, Atlantic Red Snapper (*Lutjanus campechanus*) Fishing History Timeline, SEDAR41-

DW23, at 4–6 (Jul. 21, 2014) (describing early red snapper fishing off Florida's east coast), *available at* https://sedarweb.org/documents/s41dw23-atlantic-red-snapper-lutjanus-campechanus-fishing-history-timeline.

102. By the 1960s, however, Florida's population had more than doubled and the other states were starting to increase as well. Fiberglass boats and more reliable outboard motors revolutionized the saltwater angling experience, and participation surged. As a consequence, recreational landings of offshore species like red snapper jumped, often rivaling commercial landings. *See, e.g.*, SEDAR 73 Update, *supra* ¶72, at 32 (Table 12) (showing comparable landings by weight through the 1960s).

103. From the 1970s through the 1990s, recreational saltwater angling boomed—transforming from a hobby for locals into a multi-billion dollar industry. Composite fishing vessels proliferated, and powerful outboard motors allowed access to offshore fishing grounds that previously were out of reach. Electronic navigational aids became more common, and tackle evolved to be stronger and more efficient. *See, e.g.*, Hudson, SEDAR41-DW23, *supra* ¶78, at 10–12; Loren McClenachan, Recreation and the "Right to Fish" Movement: Anglers and Ecological Degradation in the Florida Keys, 18 Env. Hist. 76, 77 (2012) (noting technological changes in this period that increased recreational fishing power).

104. By the time the Snapper-Grouper FMP was adopted, recreational red snapper landings in the South Atlantic routinely were exceeding commercial landings—and often by large amounts. *See* SEDAR 73 Update, *supra* ¶72, at 32 (Table 12) (showing recreational landings in the millions of pounds per year for much of this period, with commercial landings in the hundreds of thousands of pounds per year).

105. Toward the end of the 20th Century, the recreational sector started to organize and consolidate the political power that comes with being a multi-billion dollar industry. This involved forming advocacy groups, both nationally and in the South Atlantic region. Groups included the American Sportfishing Association (formed in 1994), South Atlantic chapters of the Coastal Conservation Association (early 1990s), and the Recreational Fishing Alliance (established 1996 and recently wound down), as well as generalist groups like the Congressional Sportsmen's Foundation (1989) and the Theodore Roosevelt Conservation Partnership (2002).

106. These recreational advocacy groups rolled out a "right to fish" campaign, in which they aggressively opposed any limitation on recreational angling, such as time or area closures, permitting systems, or catch limits. *See, e.g.*, McClenachan, 18 Env. Hist. at 82–84 (noting ideological development). The groups also moved into legislative lobbying, pushing for changes to state law as well as the Magnuson-Stevens Act. *See id.* at 83 & n.30 (describing state legislative efforts); Center for American Progress, The Rise of the Recreational Fishing Lobby (Mar. 19, 2018), https://www.americanprogress.org/article/rise-recreational-fishing-lobby; *cf.* Grant S. McCall, A Political Ecology of Fisheries Regulation and Community Resilience in the Coastal Mississippi River Delta, Southeast Louisiana, U.S.A., 2025 Water 3187, at 16 (noting similar and slightly earlier development in Gulf of Mexico region, involving a strong "rise in the political influence" of the recreational sector).

107. From 2000 to today, the factors driving growth of recreational angling have only increased. Coastal population continues to rise, with strong year-over-year growth. *See, e.g.*, J. Kevin Craig et al., Ecosystem Status Report for the U.S. South Atlantic Region, NOAA Tech. Memo. No. NMFS-SEFSC-753, at 89 (Nov. 2021) (Figure 9.1b), *available at* https://repository.library.noaa.gov/view/noaa/33280. And there continue to be new

"technological (vessel size, engine displacement, GPS and other technology) and social (communication through social media) innovations that continue to increase recreational fishing power." *Id.* at 114.

**Escalating Recreational Dead Discards of Red Snapper**

108. With ever-increasing recreational fishing power, recreational catch has become the primary driver of stock status for South Atlantic red snapper. Through the 1980s and 1990s, catch was primarily in the form of landings. Since then, it has shifted to be predominately dead discards. Red snapper dead discards occur because recreational anglers continue to fish for other co-occurring species throughout the year, even when red snapper is closed (i.e., it cannot be landed). As they fish for co-occurring species, anglers bring up—and discard—hundreds of thousands of red snapper each year.

109. The dominance of recreational catch, and the shift from landings to dead discards, was noted as early as 2008, when NMFS conducted a new stock assessment for South Atlantic red snapper. The agency again found the stock subject to overfishing (i.e., fish were being removed from the population too rapidly) and overfished (i.e., the population size was too small). *See* Southeast Data, Assessment, and Review, SEDAR 15 Stock Assessment Report 1 (SAR 1): South Atlantic Red Snapper, Section I at 12 (Mar. 2009), *available at* https://sedarweb.org/documents/sedar-15-stock-assessment-report-south-atlantic-red-snapper. The new assessment noted that "[t]he bulk of landings of red snapper come from the recreational fishery, which have exceeded the landings of the commercial fishery by 2-3 fold over the assessment period," and also that the existing 12-inch size limit was "believed to have caused an increase in discarding." *Id.*

110. NMFS and the South Atlantic Council responded to the new stock assessment with Amendment 17A to the Snapper-Grouper FMP. That amendment, adopted in 2010, acknowledged the stock had failed to rebuild by its deadline of 2008, and established a new rebuilding timeframe for red snapper of 35 years. This meant the red snapper stock now would be fully rebuilt and healthy by the year 2044. *See* South Atlantic Fishery Management Council, Amendment 17A to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at S-1 to S-20 (July 2010), *available at* https://safmc.net/documents/snapper-grouper-amendment-17a.

111. Shortly thereafter, a new stock assessment for red snapper was released. The new assessment again found red snapper to be subject to overfishing (i.e., the fishing mortality rate was too high), and overfished (i.e., the remaining population was too small). *See* Southeast Data, Assessment, and Review, SEDAR 24 Stock Assessment Report: South Atlantic Red Snapper, Section I at 8 (Oct. 2010), *available at* https://sedarweb.org/documents/sedar-24-stock-assessment-report-south-atlantic-red-snapper. The assessment noted that "[r]ecreational fleets dominate the total [fishing mortality]" for red snapper, *id.* at 11, and found that dead discards had comprised a significant portion of total red snapper catch in recent years, *id.* at 15.

112. NMFS and the South Atlantic Council made several adjustments to red snapper management over the next decade, all of which were ineffectual at constraining catch of the stock. *See, e.g.*, 77 Fed. Reg. 51,939 (Aug. 28, 2012) (temporary rule allowing harvest); 78 Fed. Reg. 44,461 (July 24, 2013) (Amendment 28 final rule, establishing new system for catch limits); 82 Fed. Reg. 50,839 (Nov. 2, 2017) (temporary rule, departing from said system in order to allow harvest).

113. Another stock assessment was conducted mid-decade, which once again concluded that South Atlantic red snapper was subject to overfishing (i.e., the rate of removals was too high) as well as overfished (i.e., the population remaining was too small). *See* Southeast Data, Assessment, and Review, SEDAR 41 Stock Assessment Report Revision 1: South Atlantic Red Snapper, Section VII (Apr. 2017), *available at* https://sedarweb.org/documents/sedar-41-stock-assessment-report-south-atlantic-red-snapper-revision-1-april-2017. NMFS determined the stock assessment represented the best available science, and published a Federal Register notice confirming that South Atlantic red snapper had again been found to be subject to overfishing and overfished. *See* 82 Fed. Reg. 18,434 (Apr. 19, 2017).

114. By this point it was well-understood that "the majority of the estimated fishing mortality [for red snapper] occurred from estimated dead discards." 82 Fed. Reg. at 50,840; *see also* 82 Fed. Reg. 1720, 1720 (Jan. 6, 2017) ("Discard mortality, particularly from the recreational sector, continues to be a significant source of overall mortality for red snapper."); 83 Fed. Reg. 22,938, 22,939 (May 17, 2018) ("[M]ost of the catch is now discarded . . . ."); 83 Fed. Reg. 35,428, 35,428 (July 26, 2018) ("[A] large majority of the estimated fishing mortality was attributed to very large and uncertain dead discard estimates . . . ."); South Atlantic Fishery Management Council, Amendment 43 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at D-1 (Nov. 20, 2017) ("Since 2010, estimates of dead discards have accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species."), *available at* https://safmc.net/documents/snapper-grouper-amendment-43.

115. In response to the new stock assessment, NMFS and the South Atlantic Council passed Amendment 43 to the Snapper-Grouper FMP. Amendment 43 originally was described as

a package that would include management measures to deal with dead discards. *See* 82 Fed. Reg. at 1720 (notice of intent to prepare EIS) ("[T]he Council is considering methods to reduce discard mortality in Amendment 43 including spatial and temporal closures . . . changes to allowable fishing gear types (e.g., circle hooks), and requiring the use of descending devices and/or venting tools for released fish.").

116. Under substantial political pressure, however, NMFS and the Council dropped such measures from the scope of Amendment 43 and deferred them to some undefined point in the future. *See* 82 Fed. Reg. 37,441 (Aug. 10, 2017) (revised notice of intent to prepare EA) ("[T]he Council decided to reduce the scope of actions considered in Amendment 43. . . . The Council may consider [] other actions . . . in a future amendment."). No such measures were ever adopted.

**Amendment 59 and the Current Annual Catch Limit Mechanism**

117. In 2021, another stock assessment was completed for South Atlantic red snapper, which—yet again—found red snapper to be subject to overfishing (i.e., fish were being killed too rapidly) and overfished (i.e., the spawning stock biomass was too low). *See* SEDAR 73, *supra* ¶70. NMFS deemed the new stock assessment best available scientific information, and published in the Federal Register a notice stating that South Atlantic red snapper again had been determined to be "both subject to overfishing and overfished." 86 Fed. Reg. 41,022, 41,023 (July 30, 2021).

118. The new stock assessment confirmed that overfishing was being driven by recreational dead discards. *See* SEDAR 73, *supra* ¶70, Section II at 10 (noting that "the primary driver of overfishing is recreational discards," while also observing progress toward rebuilding spawning stock biomass, due to higher than expected recruitment); *id.* at 113 (Figure 27,

showing relative contributions to fishing mortality on red snapper); *id.* at 64, 66 (Tables 20 and 22, reflecting that in the terminal years of the assessment (2017–2019), an average of 85% of catch by weight came from dead discards).

119. In response to the new determination of overfishing, NMFS eventually issued a secretarial amendment to the Snapper-Grouper FMP. *See* 90 Fed. Reg. 24,527, 24,531 (June 11, 2025) (final rule); National Marine Fisheries Service, Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (May 15, 2025) ("Amendment 59"), *available at* https://repository.library.noaa.gov/view/noaa/71119.

120. NMFS conducted a stock assessment update in conjunction with its secretarial amendment. That assessment update—referred to as the SEDAR 73 Update—is the most recent stock assessment for South Atlantic red snapper to date. *See* SEDAR 73 Update, *supra* ¶72. NMFS deemed it to be the best scientific information available. *See* Amendment 59, *supra* ¶96, at H-1; 90 Fed. Reg. at 24,532.

121. The SEDAR 73 Update showed South Atlantic red snapper to be, yet again, subject to overfishing. *See* SEDAR 73 Update, *supra* ¶72, at 8; Amendment 59, *supra* ¶96, at S-1; 90 Fed. Reg. at 24,528. And, yet again, the update concluded that vast majority of fishing mortality was coming from dead discards. *See id.* ("The primary driver of overfishing remains general recreational discards."); Amendment 59, *supra* ¶96, at S-1 ("Red snapper overfishing is primarily attributed to dead discards in the recreational sector . . . ."); 90 Fed. Reg. at 24,528 ("Most of the red snapper fishing mortality is attributed to dead discards in the recreational sector.").

122. In Amendment 59, NMFS made a minor adjustment to the red snapper annual catch limit, but did nothing to address the problem of recreational dead discards. The agency

initially proposed a time/area closure that would have meaningfully reduced dead discards, but—under extreme political pressure—abandoned the plan. *Compare id.* at 15 (section heading "Action 3. Consider Reducing Dead Discards and Set Red Snapper Annual Catch Limits") *with* 90 Fed. Reg. at 24,531 ("NMFS decided to remove these actions from further consideration in the amendment.").

123. Rather than deal with the problem, NMFS instead changed the reference point that defines overfishing for South Atlantic red snapper. Specifically, Amendment 59 raised the proxy for the fishing rate at maximum sustainable yield ($F_{MSY}$) to a value that happened to match the most recent level of fishing mortality. *See id.* at 24,529 (explaining that the new $F_{MSY}$ proxy "would be $F_{2021–2023}$ [i.e., the level of fishing mortality that occurred during the years 2021–2023], and the red snapper stock would no longer be classified as undergoing overfishing ($F_{CURRENT}/F_{2021–2023} = 1.0$)").

124. Under Amendment 59, NMFS specified an overfishing limit (OFL) of 551,000 fish for South Atlantic red snapper, and an acceptable biological catch (ABC) of 509,000 fish. *See* 90 Fed. Reg. at 24,529.

125. The agency also said it was establishing a number it called the "Total ACL" for South Atlantic red snapper, which was equal to the ABC—509,000 fish—and included both landings and dead discards. *Id.* No accountability measures were set to actually constrain catch to this "Total ACL" level, though. *See id.* at 24,529–30. In fact, NMFS expressly declined to attach accountability measures to the 509,000-fish "Total ACL." *See* 90 Fed. Reg. at 24,535 (Comment and Response 17).

126. Within the "Total ACL," NMFS set aside 475,000 fish as an off-the-top deduction intended to represent both sectors' dead discards. *Id.* at 24,529. Of this amount, the vast majority

(462,650 fish) come from the recreational sector, while the commercial sector contributes only a small amount (12,350 fish). *See* NOAA Fisheries, Calculation of Exempted Fishing Permit Catch Limits for Preventing Overfishing of South Atlantic Red Snapper, at 3 (Sept. 16, 2026) ("NMFS Justification Document") (Table 1), *available at* https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/south-atlantic-red-snapper-state-data-collection-and-management.

127. To be very clear, because the projected dead discard component within the "Total ACL" is subtracted before any fish are made available to the sectors for landings, it functions as an off-the-top deduction. The amount of landings available to both sectors is what remains after the projected dead discards are subtracted from the "Total ACL." For that reason, the dead discard deduction is "paid for" by both sectors equally, rather than by each sector according to how much it contributes to the dead discard amount.

128. NMFS then allocated the remaining 34,000 fish within the "Total ACL" to the two sectors, pursuant to the governing allocation ratio of 28.07% commercial / 71.93% recreational, for use as landings. *See* 90 Fed. Reg. at 24,529–30. Continuing its practice from Amendment 43, NMFS designated a landings-only ACL for each sector (recreational and commercial), and provided accountability measures to constrain each sector's landings to its respective number. *See id.* at 24,529 (Recreational ACL of 22,797 landed fish and Commercial ACL of 102,951 pounds of landings); *id.* at 24,530 ("The sector accountability measures (AMs) are directly related to the sector ACLs which represent landed catch.").

129. Under Amendment 59, the Recreational ACL of 22,797 landed fish supported a recreational season of two days in 2025. *See* 90 Fed. Reg. at 24,530; Ellie Corbett & Chloe Ramsay, Florida Fish & Wildlife Conservation Commission, Recreational Effort, Catch, and Biological Sampling in Florida During the 2025 South Atlantic Red Snapper Season, F-5573-23-

F2, at 7, 14 (Dec. 3, 2025) (estimating 24,885 red snapper landed in Florida alone during the two-day season), *available at* https://myfwc.com/media/ez0i1lof/atlantic-red-snapper-2025.pdf.

**Recreational Catch Data Collection Systems**

130. Recreational catch of South Atlantic red snapper is estimated through several survey programs. The principal federal program is the Marine Recreational Information Program ("MRIP"), which combines a mail-based Fishing Effort Survey ("FES") with a dockside Access Point Angler Intercept Survey, to estimate effort and catch for private recreational anglers. Florida supplements MRIP-FES with its own State Reef Fish Survey ("SRFS"), a state-run program that provides additional intercepts for private anglers at access points known to be used for offshore bottomfishing trips. In recent years, Florida also has run a specialized East Coast Red Snapper dockside survey ("Mini-Season Survey") during the short federal red snapper seasons, to measure effort and catch across the days in which red snapper has been open for the recreational sector in the South Atlantic. For-hire catch is estimated through separate programs, including the Southeast Region Headboat Survey and MRIP's for-hire survey.

131. These programs produce estimates in different "currencies," even if they are measuring the same underlying fishing activity. For example, for the private angler component, SRFS tends to produce substantially lower estimates of both landings and discards than MRIP-FES does, in a given year.

132. The numerical values established in Amendment 59 were derived from the SEDAR 73 Update, which used a blend of data sources. The data sources included MRIP-FES estimates for out-of-season private angler discards coastwide, and Florida's Mini-Season Survey for in-season landings and dead discards in Florida. *See* 90 Fed. Reg. at 24,532 (Comment and Response 4). As a result, the numerical values in Amendment 59 can only be compared

accurately against incoming data from the respective sources that were used in calculating the value in the first place.

133. The established method for transitioning a stock's reference points from one survey currency to another is through the stock assessment process, so that the historical catch time series, the resulting population estimates, and the projected catch levels are all expressed in consistent units. *See* NMFS Procedural Directive 04-114-01, Guidance and Procedures for the Transition Process for Modification of Recreational Fishing Catch and Effort Methods, *available at* https://media.fisheries.noaa.gov/dam-migration/04-114-01.pdf. NMFS and Florida have done exactly this for other stocks, for example by re-running the Gulf of Mexico gag grouper assessment in SRFS units, to enable catch accounting against incoming SRFS estimates. *See* Southeast Fisheries Science Center, SEDAR 72 Gulf of Mexico Gag Grouper Operational Assessment Report Amendment: State Reef Fish Survey (SRFS) Run (Sept. 15, 2022), *available at* https://sedarweb.org/documents/sedar-72-gulf-of-mexico-gag-grouper-operational-assessment-report-amendment-state-reef-fish-survey-srfs-run.

134. A new benchmark stock assessment for South Atlantic red snapper, SEDAR 90, is currently underway. *See* SEDAR 90: South Atlantic Red Snapper, https://sedarweb.org/assessments/sedar-90-south-atlantic-red-snapper. SEDAR 90 is scheduled for peer review in December 2026, and is expected to use SRFS estimates as the input for private angler landings and dead discards. *See* NMFS Justification Document, at 3. This will be the first time the model projections for South Atlantic red snapper will produce estimates in SRFS units.

**The First Round of Exempted Fishing Permits**

135. Recreational advocacy groups began meeting with state agencies and supportive members of Congress in 2024, with the goal of increasing access to South Atlantic red snapper

for recreational anglers. *See, e.g.*, North Carolina Division of Marine Fisheries, Application for Exempted Fishing Permit, at PDF 4 (Jan. 23, 2026) ("NC First Application") (describing process in which "recreational angler groups reached out to the South Atlantic states"), *available at* https://www.fisheries.noaa.gov/s3/2026-02/North-Carolina_NCDMF_EFP-application_January-2026.pdf; South Carolina Department of Natural Resources, Application for Exempted Fishing Permit, at PDF 5 (Jan. 23, 2026) ("SC First Application") ("These [Exempted Fishing Permit] applications are the result of numerous meetings between July 2024 and August 2025 between the South Atlantic states and recreational fishing interest groups . . . ."), *available at* https://www.fisheries.noaa.gov/s3/2026-02/South-Carolina_SCDNR_EFP-application_January-2026.pdf.

136. The groups settled on an approach of asking NMFS for a large increase in recreational open-season days, packaged with various "tests" of recreational data collection methods, and to do so through exempted fishing permits rather than through the council process under the Magnuson-Stevens Act. *See, e.g.*, Georgia Department of Natural Resources, Application for Exempted Fishing Permit, at 2 (Jan. 23, 2026) ("GA First Application"), *available at* https://www.fisheries.noaa.gov/s3/2026-02/Georgia_GADNR_EFP-application_January-2026.pdf; Florida Fish & Wildlife Conservation Commission, Application for Exempted Fishing Permit, at 2–3 (Jan. 23, 2026) ("FL First Application"), *available at* https://www.fisheries.noaa.gov/s3/2026-02/Florida-EFP-Application_January-2026.pdf.

137. Major recreational fishing corporations apparently were involved as well, and volunteered to underwrite the effort. *See, e.g.*, North Carolina Division of Marine Fisheries, Press Release: North Carolina Recreational Red Snapper Season Will Open for 62 Days (May 4, 2026) (noting Yamaha Motors sponsorship), *available at* https://www.deq.nc.gov/news/press-

releases/2026/05/04/north-carolina-recreational-red-snapper-season-will-open-62-days; Georgia Department of Natural Resources, Press Release: NOAA Approves Red Snapper EFP, Two-Month Season Set for 2026 (May 1, 2026) (similar, including a quote from Yamaha U.S. Marine Business Unit executive), *available at* https://gadnr.org/News/260501RedSnapper.

138. The key to this effort was asking NMFS to bless and implement the proposals via exempted fishing permit, thereby avoiding the usual council-based management process under the Magnuson-Stevens Act. Not only were the advocacy groups and their allies unlikely to secure South Atlantic Council approval for their proposals, but they also clearly were asking for far more recreational catch of red snapper than would be allowed under the Act.

139. The states submitted their final applications for exempted fishing permits to NMFS on January 23, 2026, and the agency published them in the Federal Register for public comment. *See* 91 Fed. Reg. 6827 (Feb. 13, 2026). None of the four applications stated the amount of red snapper expected to be harvested under the requested permit, as NMFS's regulations require. *See* 50 C.F.R. § 600.745(b)(2)(v). When NMFS asked the states to supply a number, they refused. Florida stated that "the EFP is not predicated on a number of fish, and for [NMFS] to request a number—even an estimated number—is inappropriate and unnecessary." *Southeastern Fisheries Ass'n*, Slip Op. at 19 (quoting Florida's application).

140. NMFS received comments on the states' applications from various parties. Among others, Ocean Conservancy and Plaintiff Slash Creek pointed out that the proposed seasons would cause overfishing and would exceed the Recreational ACL many times over. *See id.*, Slip Op. at 16.

141. Between May 1 and May 5, 2026, NMFS issued the four exempted fishing permits as requested. The Florida permit authorized a 39-day recreational red snapper season in

federal waters off Florida beginning May 22, 2026, with additional days in October; the Georgia, South Carolina, and North Carolina permits each authorized a 62-day season beginning July 1, 2026. *See id.*, Slip Op. at 6. Each permit exempted participants from 50 C.F.R. §§ 622.181(c)(2), 622.183(b)(5)(i), and 622.193(y)(2)—that is, from the red snapper season closure, the season-setting provision, and the Recreational ACL and its accountability measures. *See Southeastern Fisheries Ass'n*, Slip op. at 6.

**Preliminary Injunction and Aftermath**

142. On May 5, 2026, Plaintiff Slash Creek and others filed suit in this Court challenging the four permits under the Magnuson-Stevens Act and the APA, and moved for a preliminary injunction. The American Sportfishing Association and Coastal Conservation Association intervened as defendants; Ocean Conservancy and Environmental Defense Fund filed amicus briefs in support of the plaintiffs. *See id.*, Slip Op. at 7.

143. On May 21, 2026, this Court granted a preliminary injunction, barring the effectiveness of the permits.

144. Regarding the availability of preliminary injunctive relief, the Court held that the permits were issued under the separate autority of 16 U.S.C. § 1867(d) and 50 C.F.R. § 600.745(b), outside the Snapper-Grouper FMP regulations, so ordinary APA review and preliminary relief were available. *Southeastern Fisheries Ass'n*, Slip Op. at 9–11.

145. On the merits, the Court held that exempted fishing permits "must comply with the MSA" and must "address" the "needs" identified in the Act, including the need to prevent overfishing, *id.*, Slip Op. at 12–15; that NMFS had acted arbitrarily and capriciously by failing to respond to significant comments showing the permits would lead to overfishing, *id.*, Slip Op. at 15–18; that NMFS had violated its own regulations by granting applications that omitted the

required harvest estimates, *id.*, Slip Op. at 18–20; and that Congress had not given NMFS "unbridled discretion to circumvent the MSA and fishery management plan framework through the EFP process," *id.*, Slip Op. at 20.

146. The Court also observed that it had "reservations over whether an extended season would significantly improve the quality of the data concerning red snapper mortality, as the Government purports," because "the main driver of red snapper mortality is dead discards occurring outside the open season," *id.*, Slip Op. at 25 n.12, and the proposed data collection programs would do nothing to improve data in that regard.

147. Florida responded to the injunction by opening recreational red snapper harvest in its state waters on May 22, 2026—the day the federal season would have opened under Florida's enjoined permit—and keeping it open thereafter. *See* Florida Fish & Wildlife Conservation Commission, Request for an Exempted Fishing Permit for Data Collection in Support of Management of the Private Recreational and For-Hire Components of the Red Snapper Recreational Fishery Off Florida's Atlantic Coast for 2026, at 6 (July 10, 2026) ("FL Second Application"), *available at* https://www.fisheries.noaa.gov/s3/2026-08/fwc_rs-efp-application_07102026.pdf. Florida's Governor publicly urged anglers to go fishing for red snapper, and stated that Florida law enforcement officers would not enforce the injunction. *See* A.G. Gancarski, Gov. DeSantis Snaps Back at Red Snapper Setback, Florida Politics (May 22, 2026), https://floridapolitics.com/archives/797892-desantis-snapper-red.

148. It is widely known that the large, targeted red snapper off northeast Florida—the center of abundance for the South Atlantic stock—are found predominantly in federal waters. *See, e.g.*, Beverly Sauls & Dominique Lazarre, SEDAR90-RD-05: Recreational Effort, Catch and Biological Sampling in Florida During the 2019 South Atlantic Red Snapper Season, at 12,

14 (Mar. 2025), *available at* https://sedarweb.org/documents/sedar-90-rd05-recreational-effort-catch-and-biological-sampling-in-florida-during-the-2019-south-atlantic-red-snapper-season.

149. Upon information and belief, a substantial quantity of red snapper has been landed on Florida's East Coast since May 22, 2026, whether taken in state waters or taken in federal waters and reported as state-waters catch. *See, e.g.*, Nicolás Rivero, Behind the Anger and Scientific Brawl over Florida's Atlantic Red Snapper Season, Florida Trib (Aug. 4, 2026) (quoting a federally permitted charter operator who acknowledged that "private anglers and other charter boat operators are landing red snapper in federal territory and pretending they came from state waters," and that "[t]hey're not even hiding it . . . They're posting it all over social media"), *available at* https://floridatrib.org/2026/08/04/red-snapper-story. The annual catch limits for South Atlantic red snapper are stock-based, and include fish landed from both state and federal waters. *See* 90 Fed. Reg. at 24,532.

150. Florida has acknowledged that catch estimates for this period exist from its SRFS program, but has refused to release them. *See* Rivero, supra (quoting FWC spokesperson).

151. On June 18, 2026, Georgia asked to withdraw its application and relinquish its permit. On June 19, 2026, Florida, South Carolina, and North Carolina asked NMFS to cancel their permits. NMFS rescinded all four permits by letters dated June 26, 2026. *See* 91 Fed. Reg. 51,467, 51,471 (Aug. 10, 2026); FL Second Application, at 6. NMFS did not open the regular federal recreational red snapper season in July 2026, "[i]n anticipation of resubmittal of new EFPs." NOAA Fisheries Southeast Regional Office, Predicted 2026 North Carolina Red Snapper Federal Recreational Season, at 1 (Sept. 17, 2026) ("NC Projection Memo"), *available at* https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/south-atlantic-red-snapper-state-data-collection-and-management.

## THE CHALLENGED AGENCY ACTION

**A Second Attempt at Exempted Fishing Permits**

152. Following the injunction, Florida, Georgia, and South Carolina coordinated on a second round of applications. *See* FL Second Application, at 30. North Carolina elected not to reapply, and instead asked NMFS to set a separate federal recreational season off North Carolina. *See* 91 Fed. Reg. at 51,467.

153. On July 10, 2026, Florida, Georgia, and South Carolina each submitted a new application. *See* FL Second Application; Georgia Department of Natural Resources, Exempted Fishing Permit Application (July 10, 2026) ("GA Second Application"), *available at* https://www.fisheries.noaa.gov/s3/2026-08/gadnr_rs-efp-application_07102026.pdf; South Carolina Department of Natural Resources, Exempted Fishing Permit Application (July 10, 2026) ("SC Second Application"), *available at* https://www.fisheries.noaa.gov/s3/2026-08/scdnr_rs-efp-application_07102026.pdf. The applications described their purpose as testing state data collection and management strategies, and also as "providing recreational fishermen . . . increased fishing opportunities for red snapper." 91 Fed. Reg. at 51,467.

154. Each state requested a 31-day recreational red snapper season running the month of October, 2026, with the possibility of additional open days in December if the state determined its "harvest cap" had not been reached in October. *See* FL Second Application, at 12–14, 20; GA Second Application, at 5; SC Second Application, at 9. The states requested exemption from the same three regulations as before: 50 C.F.R. §§ 622.181(c)(2), 622.183(b)(5)(i), and 622.193(y)(2). *See* 91 Fed. Reg. at 51,471.

155. This time the applications contained harvest numbers. Florida requested 185,379 red snapper, Georgia requested 10,759, and South Carolina requested 19,253, for a combined

total of 215,391 landed fish across the three states. *See* FL Second Application, at 12; GA Second Application, at 3; SC Second Application, at 9; 91 Fed. Reg. at 51,468.

156. The states arrived at these numbers through a shared methodology developed by Florida. *See* FL Second Application, at 7–9 & App'x 3; GA Second Application, at 3, 13–14. The methodology began with what the states believed was the recreational dead discard component of the Amendment 59 "Total ACL"— 463,033 fish—which the states characterized as being in "MRIP units." The states calculated a ratio of 2.15 between recent MRIP-FES and SRFS estimates of recreational dead discards, and divided the 463,033 figure by that ratio to produce an "SRFS-equivalent" dead discard component of 215,344 fish. *See* FL Second Application, at 8.

157. The states then subtracted the SRFS-equivalent figure from the MRIP-unit figure, and declared the difference to be available for recreational harvest: "the difference between these two dead discard estimates (i.e., 463,033 fish – 215,344 fish = 247,688 fish) should be available for harvest." FL Second Application, at 9. A few further steps were taken, but this was the central logic of the states' applications. *See generally* 91 Fed. Reg. at 51,468.

158. To project how much of that total would be landed in each state during October, the states constructed daily harvest rates. Florida calculated that it would land 5,980 fish per day if it were granted an October red snapper open season. Georgia and South Carolina calculated they would land 347 and 621 fish per day, respectively. *See* NMFS Justification Document, at 5.

159. The applications proposed to require anglers to use a phone-based app to declare red snapper fishing trips. Florida said it would use its own already-existing app, while Georgia and South Carolina said they would use a new phone-based app referred to as "VESL." Catch

reporting would be voluntary through the app in Florida, and mandatory in Georgia and South Carolina. *See generally* 91 Fed. Reg. at 51,468–71.

160. The applications did not propose any measure to reduce out-of-season recreational dead discards, which remain the primary source of fishing mortality on the stock. The applications stated that the proposed seasons would not increase fishing mortality because recreational effort for snapper-grouper species occurs year-round regardless of the red snapper season. *See, e.g.*, FL Second Application, at 21.

161. The applications did not address allocation. Florida's application stated that the "request does not include changes to the existing management measures for the commercial fishery," and that the permit "is not intended to affect the existing management measures for the commercial fishery." FL Second Application, at 21.

**Public Comment**

162. NMFS determined the applications warranted further consideration and published notice of them in the Federal Register on August 10, 2026, with a fifteen-day comment period. *See* 91 Fed. Reg. 51,467. The notice stated that the new applications "include additional information found lacking by the Court and otherwise address issues where the Court found the underlying record insufficient to support the agency's decisions." *Id.* at 51,471.

163. Several commenters, including Plaintiff Slash Creek (joined by others) and Ocean Conservancy together with Earthjustice, submitted detailed objections. *See* Letter from Seth Atkinson, o/b/o Slash Creek Waterworks, Inc. and others, to Andy Strelcheck, NMFS (Aug. 25, 2026) ("Slash Creek Letter"); Letter from Meredith Moore, Catherine Bruger, and Andrea Treece, Ocean Conservancy and Earthjustice, to Andy Strelcheck, NMFS (Aug. 25, 2026) ("Ocean Conservancy Letter").

164. These commenters explained that the states' "dead discard savings" rested on a unit error. Specifically, subtracting a quantity expressed in SRFS units from the same quantity expressed in MRIP units does not identify extra fish—any more than converting a budget from dollars to pounds and subtracting the two figures identifies extra money. *See* Slash Creek Letter, at 4–6; Ocean Conservancy Letter, at 7–9.

165. The commenters observed that the correct way to re-denominate the stock's reference points in SRFS units is through the stock assessment process, as NMFS and Florida had done for Gulf gag grouper. They also pointed out that SEDAR 90 was already underway, and would be doing exactly that. *See* Slash Creek Letter, at 5; Ocean Conservancy Letter, at 6–7.

166. The commenters further explained that the requested harvest levels exceeded the Recreational ACL roughly nine-fold on their face, and roughly eighteen-fold when the states' SRFS-unit private-angler figures were converted back into the units in which the limit was set. *See* Slash Creek Letter, at 7.

167. The commenters pointed out that red snapper landings had been occurring in Florida since May 22, that those landings count against the stock's annual catch limits whether taken in state or federal waters, and that NMFS was obligated to account for them before authorizing any further landings. *See id.* at 2–4; Ocean Conservancy Letter, at 3.

168. The commenters further noted that the applications would do nothing to reduce out-of-season dead discards, the central problem in the fishery. *See* Slash Creek Letter, at 9; Ocean Conservancy Letter, at 2.

169. Lastly, one of the commenters explained that if any additional fish were in fact available for landings consistent with the Act, those fish would have to be allocated between the sectors under the governing 28.07% commercial / 71.93% recreational allocation ratio, and that

allocating new fish entirely to the recreational sector would be a de facto reallocation in violation of National Standard 4. *See* Slash Creek Letter, at 9 (citing *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 200–01 (D.D.C. 2014)).

**NMFS's Justification**

170. On September 16, 2026, NMFS published a six-page document setting out its rationale for issuing the permits, titled "Calculation of Exempted Fishing Permit catch limits for preventing overfishing of South Atlantic red snapper." *See* NMFS Justification Document.

171. NMFS agreed with the commenters that the states' methodology was flawed. The agency acknowledged that "the state harvest levels switch between Marine Recreational Information Program (MRIP) and Florida State Reef Fish Survey (SRFS) currencies," and that "[b]y using different currencies, the amount of fish that may be landed is inflated and risks overfishing occurring." NMFS Justification Document, at 2.

172. Rather than deny the applications, however, NMFS constructed a different calculation of its own. The agency took the Amendment 59 reference points—the 551,000-fish overfishing limit and the 509,000-fish "Total ACL," which it characterized as "MRIP-based"—and converted them into what it called "SRFS-equivalent" values. To do so, NMFS applied conversion ratios drawn from a working paper prepared for the pending SEDAR 90 stock assessment (4.029 for landings and 2.0704 for discards). *Id.* at 3. NMFS applied the ratios only to the MRIP private-angler components of landings and discards; headboat, charter, and Florida Mini-Season Survey landings were left in their original units. See id. at 3–4.

173. The result was an "SRFS-equivalent" total annual catch limit of 276,600 fish and an "SRFS-equivalent" OFL of 299,423 fish. *See id.* at 4 (Table 2). With the corresponding portion converted from MRIP to SRFS, the Recreational ACL came to 21,726 landed fish, and

the recreational sector's share of the dead discard component came to 231,311 fish. *See id.* at 3–4 (Table 2).

174. NMFS then departed from the Amendment 59 mechanism. Instead of treating the projected dead discard component as an off-the-top deduction, pursuant to Amendment 59, NMFS decided this component as a pot of available fish that could be used for landings, in an ad-hoc manner, if it believed actual recreational dead discards were going to come in below the projected value from Amendment 59.

175. Specifically, NMFS replaced the Amendment 59 projected recreational dead discard amount (231,311 SRFS-unit fish) with an estimate of actual dead discards from the previous year (163,073 SRFS-unit fish). *See id.* at 3–5. NMFS reasoned that "[i]f 2026 dead discards are similar to 2025, then recreational landings could be increased while still remaining at or below the ACL or OFL." *Id.* at 4.

176. NMFS then calculated how much room was left below the OFL and the "Total ACL" respectively, if dead discards this year were to come in at the same level they did last year. In doing so, NMFS assumed that commercial landings and dead discards would be at the Amendment 59 "Total ACL" projected levels. *See id.* at 4–5. This is the critical step, where NMFS treated the difference between the projected recreational dead discard component in Amendment 59 and actual dead discards estimated to have occurred in 2025, as a pool of fish newly available to be landed in 2026.

177. The agency's calculation yielded two alternative "recreational harvest levels" for 2026: 89,964 SRFS-unit fish to stay below the "Total ACL," and 112,787 SRFS-unit fish to stay below the OFL. *See id.* at 5 (Table 4).

178. NMFS chose to grant the requested Exempted Fishing Permits based on the higher OFL figure. This resulted in a 112,787-fish recreational harvest level, which the agency apportioned into a 14-day recreational red snapper open season for each of the three applicant states, and a residual amount of 15,514 fish left "unassigned." *See id.* at 5 (Table 5).

179. Had NMFS chosen to aim at the Total ACL value instead of the OFL, it would have resulted in a 89,964-fish recreational harvest level, an 11-day recreational season for each of the three states, and 12,375 fish left unassigned. *Id.*

180. NMFS acknowledged that the overfishing limit was the riskier choice. It stated that "[s]etting the harvest level commensurate with the ACL allows for a buffer between the OFL and ACL in the event that actual landings and dead discards are greater than estimated herein," and that "[s]etting the harvest level consistent with the OFL would increase the risk of overfishing." *Id.* at 6. NMFS nonetheless selected the overfishing limit. *Id.*

181. NMFS acknowledged that its projections, as well as the catch rates provided by the states "are uncertain," that "[r]ed snapper has not been open in October for many years," and that "it is unclear how effort may change in response to an EFP season." *Id.*

182. With respect to the unassigned fish in NMFS's calculation, the agency described them as serving three purposes at once: covering landings during a federal season off North Carolina, providing "a buffer for overfishing," and "allow[ing] for additional state water landings reported in 2026." *Id.* at 5.

183. NMFS did not attempt to estimate the recreational red snapper landings that had already occurred on Florida's East Coast since May 22, 2026. *See id.* at 4–5 (noting the harvest-level estimates "do not account for state water landings that may have occurred in 2026").

184. NMFS also did not address allocation. It did not acknowledge that the recreational harvest level it had calculated was more than five times the Recreational ACL in the same units, or that the commercial sector's landings would remain unchanged even as recreational landings went up dramatically. It never appeared to consider whether any of the fish it believed to be newly available for landings should be allocated between the sectors under the governing allocation ratio, and based on the publicly-available record, it did not respond to the comments raising that issue.

185. NMFS furthermore did not address accountability. It did not consider how accountability would be provided for the recreational sector if actual 2026 dead discards turn out to be higher than 2025 dead discards, or if landings under the permits exceeded the harvest limits. It furthermore did not discuss whether recreational landings should be adjusted downward from the Amendment 59 projected values, if in the future a prior year's actual dead discards come in *above* the Amendment 59 projection amount.

186. NMFS also does not appear to have considered whether an avoided dead discard and a landed fish are equivalent, from a biological, population dynamics, or stock assessment modeling standpoint. Recreational dead discards of red snapper consist largely of small, young fish, in the range of three to five pounds; fish landed during a directed season are predominantly larger and older, in the range of nine to thirteen pounds, with substantially greater reproductive output. NMFS chose not to re-run stock assessment projections or conduct any other analysis to determine the impact on the South Atlantic red snapper stock of substituting a large number of dead discards in a given year for the same number of landings. It simply treated the two as interchangeable.

187. NMFS's justification additionally did not consider whether 2025 was a representative year for dead discards. It relied on a single year's dead discard estimate as the basis for its recalculation and "discovery" of extra fish, without examining the variability of estimated dead discards across years, or whether the 2025 value represents an unusually low value compared to other recent years. NMFS did not explain why the 2025 estimate should be preferred, as a predictive value for 2026, over the aggregated projection value for recreational dead discards that is used in the Amendment 59 annual catch limit mechanism.

188. NMFS was reminded and appears to have not considered that whether the South Atlantic red snapper stock is actually heading downwards, based on recent indices of abundance. *See* Ocean Conservancy Letter, at 9–10 (citing SEDAR 90 working papers showing declining video survey counts and headboat observer catch rates since 2022). Nor did NMFS consider that the SEDAR 73 Update projections themselves assumed an optimistic productivity scenario, which the recent fishery-independent indices suggest is not being realized.

189. Finally, NMFS did not explain why it was appropriate to re-denominate the stock's reference points into SRFS units via one-year Exempted Fishing Permits, using static conversion ratios and piecemeal replacement, rather than through the stock assessment and fishery management plan processes that the agency's own procedural directive calls for and that is already underway via SEDAR 90.

**Second Round of Exempted Fishing Permits**

190. On September 21, 2026, NMFS issued the three requested Exempted Fishing Permits. Each is valid through December 31, 2026. *See* Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Florida in 2026, Permit No. 26-SERO-07 (Sept. 21, 2026) ("Florida Second Permit"); Exempted

Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Georgia in 2026, Permit No. 26-SERO-06 (Sept. 21, 2026) ("Georgia Second Permit"); Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off South Carolina in 2026, Permit No. 26-SERO-05 (Sept. 21, 2026) ("South Carolina Second Permit"), *available at* https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/south-atlantic-red-snapper-state-data-collection-and-management.

191. Each Exempted Fishing Permit authorizes recreational harvest of red snapper in South Atlantic federal waters from October 9 through October 22, 2026, by participants whose trips begin and end in the permitted state.

192. Each Exempted Fishing Permit exempts participants from 50 C.F.R. § 622.181(c)(2) (limiting harvest and possession of red snapper to the specified season), 50 C.F.R. § 622.183(b)(5)(i) (specifying when the recreational season occurs), and 50 C.F.R. § 622.193(y)(2) (specifying the Recreational ACL and its accountability measures). *See, e.g.*, Florida Second Permit, at 2.

193. In place of the Recreational ACL, each permit specifies a "harvest limit": 83,720 fish for Florida, 4,859 fish for Georgia, and 8,695 fish for South Carolina. The three harvest limits total 97,274 fish. Each permit states that NMFS "projects" the limit "will be harvested within 14 days in October." *See, e.g.*, Florida Second Permit, at 2.

194. Each permit provides that after the October season, the state "will consult with NMFS . . . to determine if additional fish are available to be harvested during a second season that, if approved, would take place in December 2026," and that "NMFS and [the state] will

jointly determine if a second season may take place." *E.g.*, Florida Second Permit, at 2, 4. The permits provide no public process for that determination.

195. The permits do not condition any December reopening on an accounting for landings that occurred in Florida before October 9.

196. The permits differ in their monitoring provisions. Georgia and South Carolina require private anglers to declare each trip through the VESL application before fishing, to obtain a trip authorization code, and to submit a trip report within 24 hours. *See* Georgia Second Permit, at 3; South Carolina Second Permit, at 3. The Florida permit relies on SRFS for private-angler catch estimation, requires only a trip declaration through Florida's phone application, makes catch reporting through the application voluntary. *See* Florida Permit, at 3–4.

197. On the same day, NMFS announced the permits by fishery bulletin. *See* NOAA Fisheries Southeast Regional Office, Fishery Bulletin FB26-052: NOAA Fisheries Announces 2026 Federal Recreational Red Snapper Season and Issuance of Exempted Fishing Permits for Recreational Red Snapper Harvest in the South Atlantic (Sept. 21, 2026). The bulletin stated that the permits "have been modified to address the Court decision." *Id.* at 3.

198. Also on September 21, 2026, NMFS set the regular federal recreational red snapper season for 2026—open to anglers not participating in an Exempted Fishing Permit—at three days, October 9 through October 11, 2026. *See* 91 Fed. Reg. 60,334 (Sept. 23, 2026). NMFS projected the season using North Carolina landings alone, apportioning 3.43% of the Recreational Annual Catch Limit, or 782 fish, to North Carolina. *See id.* at 60,334–35; NC Projection Memo, at 1. The temporary rule states that the three-day season will "constrain[] overall recreational harvest of red snapper to the recreational ACL." 91 Fed. Reg. at 60,335. The

rule does not address landings by non-participating anglers in Florida, Georgia, or South Carolina during the three-day federal season, nor for landings in Florida since May 22.

**Consequences of the Exempted Fishing Permits**

199. Several factual consequences flow from NMFS's issuance of the three second-round Exempted Fishing Permits.

200. First, the Exempted Fishing Permits substantially increase the recreational sector's share of South Atlantic red snapper landings in 2026, with no corresponding change for the commercial sector, and therefore serve to change the allocation of landings in this fishery.

201. The governing allocation ratio for South Atlantic red snapper is 71.93% recreational and 28.07% commercial, established in 2012 through Amendment 25 to the Snapper-Grouper FMP after a lengthy council process. *See* 77 Fed. Reg. 15,916 (Mar. 16, 2012); South Atlantic Fishery Management Council, Comprehensive Annual Catch Limit (ACL) Amendment for the South Atlantic Region, at 53 (Table 2-23) (Oct. 2011), *available at* https://safmc.net/documents/comprehensive-annual-catch-limit-amendment-2012.

202. The governing allocation ratio was applied in Amendment 59 to portion out the 34,000-fish landings component of the "Total ACL" to the commercial and recreational sectors. *See* 90 Fed. Reg. at 24,529.

203. Commercial management proceeded in the ordinary way in 2026. That is, NMFS opened the commercial season with a 75-pound trip limit, and closed the commercial season when it believed the Commercial ACL had been landed. This means NMFS managed the commercial sector so as to allow around 11,213 landed red snapper in 2026.

204. By NMFS's own figures, the Exempted Fishing Permits raise recreational landings from the Recreational ACL of 21,726 fish (in SRFS-equivalent units) to a harvest level

of 112,787 fish, of which 97,274 are assigned to the three permits and 15,514 are held unassigned. *See* NMFS Justification Document, at 4–5 (Tables 2, 4, 5). This is more than a five-fold increase in recreational landings.

205. Using NMFS's figures, total landings of South Atlantic red snapper in 2026 will be on the order of 108,000 to 124,000 fish (depending on how much of the unassigned pool is used), of which roughly 90–91% will go to the recreational sector and 9–10% to the commercial sector. The actual allocation for 2026 thus departs sharply from the governing 71.93% recreational / 28.07% commercial ratio established in Amendment 25.

206. Through the challenged Exempted Fishing Permits, NMFS has made available a substantial amount of new red snapper for landings in 2026. Fish made available in that way should, under the governing allocation ratio, be shared 71.93% recreational and 28.07% commercial. NMFS instead allocated them 100% to the recreational sector.

207. NMFS did not acknowledge in its justification document or in the permits themselves that the Exempted Fishing Permits change the sectoral allocation of the fishery. A fortiori, the agency did not analyze whether the resulting allocation is fair and equitable or reasonably calculated to promote conservation. Nor did it appear to respond to the comments raising the issue.

208. Second, the Exempted Fishing Permits overhauled the annual catch limit mechanism for South Atlantic red snapper, for the 2026 fishing year only.

209. Amendment 59 established the Recreational ACL as 22,797 landed fish (21,726 fish in NMFS's SRFS-equivalent units). *See* 50 C.F.R. § 622.193(y)(2). The Exempted Fishing Permits ignore the Recreational ACL, and instead authorize 112,787 landed fish for the

recreational sector. This is between four and five times the Recreational ACL, before accounting for any landings that have occurred in Florida since May 22, 2026.

210. The Exempted Fishing Permits authorize a new, far higher amount for recreational landings in 2026 by purporting to re-work the Amendment 59 annual catch limit mechanism. Specifically, the Exempted Fishing Permits take the off-the-top deduction for dead discards provided by Amendment 59, and turn it into a pool of fish that suddenly can be made available to the recreational sector for landings—apparently only requiring the agency to demonstrate that actual estimated dead discards in a single past year happened to fall below the amount of the Amendment 59 set-aside.

211. Third, the high amount of recreational landings allowed by the Exempted Fishing Permits embodies a number of assumptions, calculations, and policy decisions that either do not hold up on their own terms or conflict with the statute or NMFS's own guidance or ordinary procedures. In no particular order:

212. The Exempted Fishing Permits do not account for red snapper landed in Florida between May 22 and September 22, 2026. NMFS stated that its harvest levels "do not account for state water landings that may have occurred in 2026," and offered only the 15,514-fish unassigned pool as a cushion—a pool that is simultaneously designated to cover North Carolina landings and to serve as a general buffer against overfishing. NMFS Justification Document, at 4–5. On information and belief, landings in Florida this year to date exceed 15,514 fish. *See supra* ¶¶147–150.

213. The Exempted Fishing Permits aim for the OFL level of catch for South Atlantic red snapper in 2026, rather than the "Total ACL" level. The agency itself acknowledges this is a risk-prone action, because the OFL is the threshold above which overfishing occurs. See 50

C.F.R. § 600.310(e)(2)(i)(D). The point of setting the annual catch limit below the OFL level is to provide a buffer for scientific and management uncertainty, which all fisheries have and South Atlantic red snapper has in spades. *See id.* § 600.310(f)(1)(ii)–(iii), (f)(4)(i). NMFS's own guidelines provide that a catch limit set equal to the overfishing limit may be presumed not to prevent overfishing, absent sufficient analysis and justification. *Id.* § 600.310(f)(4)(i). And the agency itself acknowledged that its choice to aim for the OFL level "would increase the risk of overfishing." NMFS Justification Document, at 6. The only rationale provided by the agency was that "[i]f overfishing did occur, the risk to the stock is small." *Id.* at 6. There was no attempt to quantify that risk, or to analyze the consequences of overfishing for the stock's rebuilding trajectory—particularly in light of recent signals that the population may be declining again.

214. The Exempted Fishing Permits depend on the assumption that 2026 recreational dead discards will be "similar to 2025." NMFS Justification Document, at 4. NMFS did not examine whether that assumption is reasonable. It did not consider year-to-year variability in dead discard estimates, and did not consider that the 14-day open seasons will themselves change discard rates in ways the agency admitted it cannot predict. *See id.* at 6. If 2026 dead discards are higher than the 2025 estimate, the harvest levels provided in the Exempted Fishing Permits will result in overfishing.

215. The Exempted Fishing Permits depend on the assumption that an avoided dead discard and a landed fish are interchangeable. They are not. Dead discards are smaller and younger than landed fish. *See supra* ¶186. Removing around 100,000 ten-pound fish from the spawning stock is not biologically equivalent to removing a comparable number of five-pound fish, and NMFS performed no analysis—no stock assessment projection, no yield-per-recruit or spawning-potential calculation—to determine what the substitution means for the stock.

216. For these reasons and others, NMFS has not shown that the Exempted Fishing Permits represent a level of catch that prevents overfishing, that stays within the stock's annual catch limits, or that is based on the best scientific information available.

217. Finally, the Exempted Fishing Permits do nothing to address recreational dead discards, which NMFS has identified for more than fifteen years as the primary driver of fishing mortality on South Atlantic red snapper. *See supra* ¶¶108–116. The permits authorize 14 days of directed harvest. They impose no measure—no time or area closure, no gear requirement beyond existing descending-device rules, no effort control—on the roughly 350 days of the year during which recreational anglers fish for co-occurring species, and end up catching and discarding red snapper. The data collected under the permits will describe landings and discards during a 14-day open season in October; they will not describe the out-of-season discard mortality that determines the stock's status. This Court noted the same disconnect in May. *See Southeastern Fisheries Ass'n*, Slip Op. at 25 n.12.

## CLAIMS FOR RELIEF

### FIRST CLAIM: DEFENDANTS LACK THE AUTHORITY TO ISSUE EXEMPTED FISHING PERMITS FOR SOUTH ATLANTIC RED SNAPPER THAT VIOLATE STATUTORY REQUIREMENTS AND/OR DOING SO WAS ARBITRARY AND CAPRICIOUS

218. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

219. Under the Exempted Fishing Permits challenged in this case, South Atlantic red snapper landings in 2026 will increase substantially. All of the increase will be recreational landings.

220. Due to the increased amount of recreational landings, the commercial sector will receive around 10% of the total red snapper landings in 2026, while the recreational sector will receive around 90% of the total.

221. The governing allocation ratio for this fishery requires 28.07% of all landings to go to the commercial sector, and 71.93% to go to the recreational sector. So under the Exempted Fishing Permits, the actual ratio of landings between the recreational sector and the commercial sector will depart significantly from the allocation ratio established in the FMP.

222. The Magnuson-Stevens Act requires Defendants to acknowledge and analyze all allocations and reallocations, ensuring among other things that they are "fair and equitable." 16 U.S.C. § 1851(a)(4)(A). For this reason, unacknowledged, tacit, or de facto reallocations are not permitted under the Act. *See, e.g.*, *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 200–01 (D.D.C. 2014).

223. Thus under the Exempted Fishing Permits, Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Section 1851(a)(4) (and associated case law).

224. Defendants do not have the power, under the Magnuson-Stevens Act, to waive application of statutory requirements to a fishery. This includes when Defendants are acting through Exempted Fishing Permits

225. Phrased differently, the Magnuson-Stevens Act does not allow Defendants to do anything through the challenged Exempted Fishing Permits that they would not be able to do otherwise in ordinary fishery management under the Act.

226. Defendants lacked authority to issue the Exempted Fishing Permits, because the permits seek to accomplish an outcome that violates a substantive requirement of the Magnuson-

Stevens Act. As such, Defendants' actions were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

227. Alternatively, Defendants' issuance of the Exempted Fishing Permits was "arbitrary, capricious . . . or otherwise not in accordance with law," *id.* § 706(2)(A), because the permits allow a violation of a statutory requirements in the Act.

228. Commercial fishermen including Plaintiffs have endured decades of restrictive trip limits for red snapper, necessitated by the recreational sector's dead discards problem. It harms Plaintiffs and other commercial fishermen directly, to deny them a fair share of any increased landings that may be available from the fishery.

229. Remedial action from this Court, as requested below, will address this harm because it will ensure fair and equitable distribution of available landings in this fishery.

230. For these reasons, Defendants' legal violations are harming Plaintiffs and will continue to harm them, unless and until the violations are remedied by this Court.

## SECOND CLAIM: DEFENDANTS LACK THE AUTHORITY TO MAKE SUBSTANTIVE MODIFICATIONS TO THE ANNUAL CATCH LIMIT MECHANISM FOR SOUTH ATLANTIC RED SNAPPER VIA EXEMPTED FISHING PERMITS AND/OR DOING SO WAS ARBITRARY AND CAPRICIOUS

231. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

232. Through the Exempted Fishing Permits challenged in this case, Defendants have temporarily enacted major changes to the annual catch limit mechanism for South Atlantic red snapper.

233. Specifically, Defendants have changed the recreational dead discard component of the Amendment 59 annual catch limit mechanism from an off-the-top set-aside into a pool of available landings for the recreational sector, apparently accompanied by the rule that the pool can be accessed to the extent estimated recreational dead discards from the prior year came out below the projected recreational dead discard component of the Amendment 59 annual catch limit mechanism (i.e., 462,650 MRIP-based fish).

234. This change appears to apply for only one year, insofar as it was enacted via the Exempted Fishing Permits.

235. The Magnuson-Stevens Act requires annual catch limit mechanisms to be codified in fishery management plans. 16 U.S.C. § 1853(a)(15). The purpose of this requirement is to ensure that annual catch limit mechanisms are subject to the debate, public input, and scrutiny that comes with the ordinary fishery management council process.

236. Because Defendants' Exempted Fishing Permits make major changes to the South Atlantic red snapper annual catch limit mechanism outside the fishery management plan, the permits are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

237. Alternatively, Defendants' issuance of the Exempted Fishing Permits was "arbitrary, capricious . . . or otherwise not in accordance with law," *id.* § 706(2)(A), because the permits purport to take an action that is not allowed by the Magnuson-Stevens Act.

238. Moreover, because Defendants' temporary revision to the annual catch limit mechanism was invalid, the Exempted Fishing Permits end up allowing far more landings than allowed by the governing Recreational ACL as established in Amendment 59—and in turn violate the statutory requirement for annual catch limits. 16 U.S.C. § 1853(a)(15).

239. Plaintiffs and other commercial fishermen and businesses have dealt with extremely low trip limits and short seasons for over fifteen years now, with South Atlantic red snapper. With rebuilding potentially on the horizon, NMFS now is suddenly making major changes to the stock's annual catch limit mechanism through a one-off action, and in doing so reallocating fish away from the commercial sector and allowing arbitrarily high catch by the recreational sector.

240. By taking a sweeping action via Exempted Fishing Permit, NMFS is avoiding the council process and its associated deliberation and public input. This kind of unpredictable action makes it extremely difficult for Plaintiffs and others to plan business decisions around red snapper's rebuilding trajectory. Annual catch limit mechanisms are at the core of fishery management, and Plaintiffs and others rely on the relative durability and certainty of mechanisms that are established in the relevant FMP.

241. By temporarily waving off the annual catch limit mechanism for South Atlantic red snapper, Defendants are undermining the integrity of the fishery management process, which harms Plaintiffs by reducing their ability to invest and make long-term business planning decisions.

242. Remedial action from this Court, as requested below, will address this harm because it will ensure decisions about the annual catch limit mechanism are made at the South Atlantic Fishery Management Council, are embodied in the FMP, and are relatively durable as a consequence.

243. For these reasons, Defendants' legal violations are harming Plaintiffs and will continue to harm them, unless and until the violations are remedied by this Court.

**THIRD CLAIM: DEFENDANTS IN ISSUING THE EXEMPTED FISHING PERMITS RELIED ON ASSUMPTIONS AND REASONING THAT DID NOT REPRESENT THE BEST SCIENTIFIC INFORMATION AVAILABLE, FAILED TO ENSURE OVERFISHING IS PREVENTED, AND/OR WERE ARBITRARY AND CAPRICIOUS.**

244. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

245. The Exempted Fishing Permits challenged in this case are premised on assumptions, decisions, and reasoning from Defendants, which do not hold up to scrutiny, violate Defendants' own policies, or represent arbitrary decision-making.

246. These include, among other things, assuming that recreational dead discards in 2026 will equal the amount of dead discards in 2025; assuming an avoided dead discard can be substituted with a landed fish; failing to estimate the amount of recreational red snapper landings that have already occurred this year; aiming management measures at the OFL level of catch; and completely ignoring the fact that the Exempted Fishing Permits do nothing to address the central problem with recreational fishing data, which is out-of-season dead discards.

247. Each of these assumptions and omissions was necessary for NMFS to be able to issue the Exempted Fishing Permits, and to conclude that doing so would not result in overfishing.

248. The Exempted Fishing Permits accordingly violate the National Standard 2 mandate to use best scientific information available, 16 U.S.C. § 1851(a)(2), the National Standard 1 requirement to ensure overfishing is prevented, 16 U.S.C. § 1851(a)(1), and basic APA requirements for agency decision-making, *e.g.*, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

249. Defendants' issuance of the Exempted Fishing Permits accordingly was "arbitrary, capricious . . . or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or

alternatively "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

250. By premising the amount of landings in the Exempted Fishing Permits on faulty assumptions and reasoning, Defendants are allowing an aggressive level of harvest this year which may result in overfishing for South Atlantic red snapper. Regardless of whether overfishing occurs, squeezing the stock this year will necessarily result in less available harvest in upcoming years.

251. Plaintiffs and other commercial fishing businesses have waited for many years for higher landings of South Atlantic red snapper. By taking a large harvest this year and reducing the amount available in the future, Defendants are prolonging the amount of time Plaintiffs and other commercial fishermen will be subjected to low trip limits and short seasons—with no benefit to themselves in the process.

252. Defendants also undermine the fishery management process, by taking an action to increase recreational landings that is based on flawed reasoning. The Exempted Fishing Permits represent a one-sided, politically-motivated action that serves to demoralize those in the commercial sector, reduce their willingness to invest in the fishery, and devalue their assets and business operations.

253. Remedial action from this Court, as requested below, will address this harm because it will ensure important harvest level decisions are made with appropriate reasoning and process, and avoid actions that risk overfishing and ignore public input.

254. For these reasons, Defendants' legal violations are harming Plaintiffs and will continue to harm them, unless and until the violations are remedied by this Court.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1. Vacate and set aside the Exempted Fishing Permits pursuant to 5 U.S.C. § 706(2);
2. Declare pursuant to 28 U.S.C. § 2201 that Defendants violated the APA and the Magnuson-Stevens Act as described above when they issued the Exempted Fishing Permits;
3. Order and enjoin Defendants to take such measures as are necessary to ensure that allowable landings of South Atlantic red snapper in 2026 and subsequent years are allocated to the commercial and recreational sectors in accordance with the governing allocation ratio for the stock;
4. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and
5. Provide Plaintiffs such additional and further relief as may be appropriate.

Dated: October 5, 2026

Respectfully submitted,

/s/ Seth Atkinson
Seth L. Atkinson (Bar ID CA00190)
Quillback Consulting
540 Meder Street
Santa Cruz, CA 95060
(203) 331-2792
seth@quillbackconsulting.com

*Attorney for Plaintiffs*